# Illinois Official Reports

## Appellate Court

---

### *People v. Landerman*, 2018 IL App (3d) 150684

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ADAM LANDERMAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0684 |
| Filed | December 3, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 13-CF-98; the Hon. Amy M. Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Yasemin Eken, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Dawn Duffy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Presiding Justice Carter and Justice O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Adam Landerman, appeals his convictions for two counts of first degree murder and sentence of natural life imprisonment. Defendant argues he received ineffective assistance of counsel where counsel raised a baseless defense that the inaudible nature of defendant's recorded statement rendered it insufficient to prove defendant's guilt. Defendant also argues that counsel was ineffective for failing to redact irrelevant and prejudicial portions of defendant's statement that were improperly admitted as other-crimes evidence. Alternatively, defendant argues that the cumulative effect of counsel's errors requires reversal of his convictions.

¶ 2    Defendant also argues that the statute mandating that he receive a sentence of natural life imprisonment was unconstitutional as applied to him because the court was without discretion to impose a lesser sentence based on defendant's youth and potential for rehabilitation. Alternatively, defendant argues his counsel was ineffective for failing to challenge the constitutionality of his sentence. Defendant also argues that the court failed to properly admonish him pursuant to Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001). We affirm.

¶ 3                              I. BACKGROUND

¶ 4    Defendant was charged with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2012)). Three codefendants—Alisa Massaro, Bethany McKee, and Joshua Miner—were also charged with the offenses. The indictment alleged that defendant and the codefendants caused the death of two victims, Eric Glover and Terrance Rankins. The indictment set forth three different theories with regard to each victim: (1) defendant and the codefendants strangled the victims with the intent to do great bodily harm, (2) defendant and the codefendants strangled the victims knowing such an act created a strong probability of death, and (3) while committing a forcible felony—namely, a robbery—defendant and the codefendants strangled the victims thereby causing the victims' deaths.

¶ 5    The State filed a motion *in limine* to admit other-crimes evidence under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). The motion alleged that the State sought to introduce evidence "of the activity after the murders, including the purchase and consumption of cocaine, the use of cannabis, attempts to get rid of the victim's vehicle, destroying the victims' cell phones, *** and other evidence that supports the offenses of concealment of a homicidal death, robbery or abuse of a corpse." The State also sought to introduce "evidence that the defendant and Joshua Miner took marijuana and cash from the victims' pockets." The motion alleged these activities occurred "very close in time to the murders at issue."

¶ 6    At the hearing on the State's motion *in limine*, the State argued that the evidence of other crimes it sought to introduce was relevant because the other crimes were "so integral in the crime in this case." Defense counsel stated she had no argument against the admission of the other-crimes evidence, but objected "[f]or the record." The court granted the motion to admit other-crimes evidence. The court reasoned that the "forcible felony of robbery[,] the motivation behind what happen on that—the date of the offense[,] and what the parties did are certainly relevant."

¶ 7    The State also filed a motion to allow the jury to use a transcript to aid its review of defendant's videotaped police interview. The motion alleged that defendant's voice was low

and could not always be heard clearly on the videotaped recording. The motion also alleged there was an audible humming that could be heard on the recording.

¶ 8 At the hearing on this motion, the State said defendant spoke very softly in the recording, but "[u]nder close listening, you can hear it." The State asserted that since the jurors would only have one chance to hear the recording, they might not hear every word spoken. The State argued the only way to guarantee that the jurors heard what was on the recording was for them to have a transcript. Defense counsel argued that the transcript should not be allowed because the case involved a video recording rather than a recording containing only audio, and the jurors might not watch the video if they were reading the transcripts. Defense counsel stated: "I think handing *** the jury a transcript to follow, they are more likely to read the State's interpretation of what's said as opposed to what's actually said on the tape." Defense counsel also argued that the jury would not necessarily have only one chance to review the video recording because they could ask to view it again during deliberations. The court indicated it would take the motion under advisement and watch the video.

¶ 9 On the day the trial began, defense counsel stated that the court needed to address the matter of the transcript. Defense counsel said she and her co-counsel had reviewed the transcript, and the State made the corrections they requested. The court asked defense counsel whether the transcript was accurate, and defense counsel said yes. The court ruled that it would allow the State to present the transcript to the jury.

¶ 10 At trial, Detective Kevin Sepulveda testified that he and another detective interviewed defendant in connection with the instant case. The interview was recorded. Sepulveda reviewed a copy of the video-recorded interview and a transcript of the conversation. Sepulveda testified that everything he read in the transcript reflected what he heard in the recording. The prosecutor asked: "And do both the transcript and this DVD that you watched fairly and accurately portray the relevant portions of the interview as stipulated to by the parties in this case?" Sepulveda said yes.

¶ 11 The State moved to admit and publish the video recording of the interview and the transcript. Defense counsel objected, and the court admitted both. Before playing the video recording and distributing copies of the transcript to the jury, the court advised the jury that the videotape, rather than the transcript, was evidence. The court explained that the transcript was "the State's interpretation of what [was] said on the tape" and was provided "merely to assist you in listening to the tape." The court advised the jury: "[I]f your understanding of the tape diverges or is different from the transcript, your own interpretation of the tape is controlling."

¶ 12 The video recording was played for the jury. In the video, defendant spoke softly and was difficult to hear at times. Defendant stated that on the night of the incident, McKee picked him up to go drinking. They went over to Massaro's house. Massaro and her boyfriend, Miner, were at the house. McKee, Massaro, Miner, and defendant planned to ask Rankins to come over and to rob him when he arrived.[1] McKee said Rankins always carried a lot of cash and marijuana. Defendant agreed to the plan because everyone else agreed, and he did not have a

_____

[1]For purposes of this opinion, we identify Rankins and Glover by name during our recounting of defendant's interview, though defendant did not know their names during the interview. Rather, defendant distinguished the two victims by their hairstyles. He said one had short hair and the other had dreadlocks. Other evidence in this case showed that Rankins and Glover were the victims, Rankins had short hair, and Glover had dreadlocks.

way to return home. An officer asked defendant how they planned to rob Rankins. Defendant replied: "Beat his a** and if things went south, that's where I come in and then grab his money, grab the bud and tell him to get the f*** out pretty much." Defendant said Miner would be the one to beat Rankins, and defendant would just be there "for support" unless Miner needed assistance.

¶ 13 McKee called Rankins and asked him to come to Massaro's house. Rankins came over with his cousin, Glover. Rankins and Glover brought a bottle of liquor. Defendant, Miner, Massaro, and McKee were not expecting Glover to accompany Rankins. When Glover arrived, the plan changed. Miner asked defendant if he could "take" one of the men, and defendant said he could. They decided to wait until they had finished the bottle of liquor before they robbed Rankins and Glover, so they would catch Rankins and Glover off guard. They planned to ask to buy some drugs from Rankins and Glover and give them $20. When Rankins and Glover took out their cash, Miner and defendant would grab it and tell Rankins and Glover to leave.

¶ 14 Defendant told Miner he did not want any part of it, but he would help Miner if he heard a scuffle or "if s*** goes on." Defendant did not know if anything would actually happen, but he planned to help Miner "if anyone started boxing" because he had known Miner longer than Rankins and Glover. Defendant had known Miner for four days and had only known Rankins for two days. Defendant did not know Glover.

¶ 15 After Rankins and Glover arrived, everyone drank, smoked, and played video games. After approximately two hours, Miner exited the kitchen and accused Rankins of raping Massaro. Miner grabbed Rankins, put him in a chokehold, dragged him into the kitchen, and began fighting with him. Glover and defendant were sitting on the couch playing video games. Glover walked over to where Miner and Rankins were fighting and tried to help Rankins. Defendant pulled Glover back and told him to let Miner and Rankins "do their thing." Glover said, "No, that's my family." Glover again tried to help Rankins, and defendant put him in a chokehold. Glover struggled and tried to headbutt defendant. Defendant tensed up and locked his legs around Glover. Glover became unconscious after approximately 60 to 90 seconds. Once defendant saw Glover was unconscious, he released him. Defendant could feel that Glover was still breathing at that time.

¶ 16 Miner walked into the room and asked defendant if Glover was dead. Defendant said he did not know. Defendant walked into the kitchen to check on Rankins. Defendant believed Rankins was dead. Rankins's chest was not moving and he was bleeding from his nose and mouth. Defendant walked back into the other room. Miner instructed defendant to hold Glover up. Defendant complied, and Miner tied up Glover. An officer asked defendant if Glover had "life left in him" when they tied him up. Defendant replied: "Not much, but yeah." Defendant said Glover was still breathing when Miner tied him up, and he made a gurgling noise a few minutes later. Miner tied up Rankins's body. Defendant and Miner moved the bodies to another room. Defendant covered Rankins's and Glover's heads with a towel and a blanket. Miner put a grocery bag over Rankins's head because he was bleeding.

¶ 17 Massaro and McKee were outside the door when the altercation took place. They came inside approximately five minutes after the fight and sat on the bed while Miner and defendant moved the bodies. Miner made McKee strike the bodies with an empty bottle, and he made Massaro kick the bodies. Miner made the women strike the bodies so they would be "an equal part of the situation." Miner also kicked the bodies. Defendant did not kick the bodies.

- 4 -

¶ 18    Defendant said they took money from the victims after they had died. Defendant held up one of the bodies while Miner searched the pockets. One of the victims had $20 and the other had approximately $100. One of the victims also had marijuana in his pocket. Defendant said Miner purchased beer, cigarettes, and a blunt with the money. Defendant said they also used the money to purchase cocaine. All four of them used the cocaine.

¶ 19    They burned the victims' cell phones and then submerged the phones in water. Defendant drove the victims' vehicle and parked it near a hospital. McKee removed a briefcase and some baby items, including boots and a child's purse, from the vehicle. Defendant, Miner, McKee, and Massaro returned to Massaro's house and drank alcoholic beverages until approximately 7 a.m. They all passed out around 7:30 a.m. Defendant went home about two hours later and took a nap. Massaro called defendant and said Miner wanted defendant to bring him garbage bags, a blowtorch, a saw, and bleach. Defendant obtained those items and returned to Massaro's house. Defendant gave Miner the items and went to the basement. Eventually, defendant heard the police arrive at the house.

¶ 20    The officers asked defendant what they planned to do with the items he gave to Miner. Defendant replied: "I guess they were just going to get rid of it. That's what I got out of it." Defendant said he knew what Miner planned to do with the bodies, but he did not want to talk about it because it was "f***ed up." Miner said he was going to cut the bodies into small pieces, place the pieces in bags, and place the bags in dumpsters in a distant town on garbage day.

¶ 21    Several police officers testified they were dispatched to Massaro's residence after receiving information that two corpses were located there. Two officers located defendant in the basement hiding behind some paneling. The officers observed a black male lying prone on the floor of a kitchenette area on the second floor of the residence. The man's head was wrapped in a plastic bag and his hands were tied behind his back. They observed a second black male lying on the floor of a bedroom with his head wrapped in a plastic bag and his hands in the same position as the other man. The officers found a cup of water containing cell phone components at the scene. Photographs and a video of the bodies and the crime scene were introduced into evidence.

¶ 22    Valerie Arangelovich, a forensic pathologist, testified that she performed the autopsies of Rankins and Glover. Arangelovich opined that the cause of death for both Rankins and Glover was strangulation. Arangelovich testified that in order for an individual to die from strangulation, there had to be a constant external obstruction to the neck for 3½ to 6 minutes. The individual's body would initially jerk violently. The individual would lose consciousness after 10 to 15 seconds. The external pressure would have to be maintained for 3½ to 6 minutes for death to ensue. Arangelovich testified there were multiple areas of red bloody hemorrhage in Glover's neck, which demonstrated evidence of blunt trauma to the neck. This indicated there was a violent struggle between the victim and offender.

¶ 23    During closing argument, defense counsel argued:
        "The only evidence in this case of what my client said is the videotape recording, not the transcript, the videotape recording. The transcript is what they believe he said. They can argue what they believe just like I can argue what I believe, but that is not what controls. What controls is what you heard.
            When the State fails to produce evidence available in support of its indictment, the State is, in effect, asking you to do its job. That is their job, not yours. Their job is to put

- 5 -

the evidence on in a coherent, decipherable manner. Not to leave you guessing. Gee, what did he say? I couldn't hear it."

Defense counsel further argued:

"Well, this case is shades of grey because we have this tape recording that we are all listening to. And I think it's fair to say we provided a transcript which the judge indicated to you was to assist you, the transcript not being evidence, the video being evidence.

I think it's a fair statement that we couldn't understand what was going on. When I say we, I mean you too. Every one of you—I was watching—were looking down at the transcript because you had no idea what [defendant] was saying. You were supposed to guess or better than guess from the State's position, take their transcript and say, well, this is what he said. This is what we believe he said.

Is that proof beyond a reasonable doubt? I submit not."

Defense counsel stated that one could maybe "hear 10, 20, 30 percent" of the recording.

¶ 24 Defense counsel also argued Miner was responsible for the deaths of both victims. Defense counsel contended Miner was responsible for Glover's death because Miner tied Glover up while he was alive but unconscious.

¶ 25 The jury found defendant guilty of the first degree murder of both Glover and Rankins.

¶ 26 Defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motion argued, *inter alia*, that the court erred by granting the State's motion to allow the transcript of the interview. The motion also alleged "the sound system the [S]tate used to present [the video recording of defendant's statement] distorted the sound and made an otherwise audible recording inaudible." The motion argued that "based upon the State's failure to present an audible recording to the jury, they failed to present any evidence as to how [defendant] should be held accountable for the actions of his co-defendants."

¶ 27 At a hearing on the motion, defense counsel argued that the transcript of defendant's interview with the police became the evidence of the State because the jurors' "eyes were glued to the transcript" while the video was played. Defense counsel argued that the jury did not actually watch the video recording. Defense counsel further argued that the video recording was inaudible because of the State's sound system. The State noted the defense stipulated to the accuracy of the transcript and argued that the State's equipment made the recording more audible. The court denied defendant's motion.

¶ 28 A presentence investigation report (PSI) was prepared. The PSI indicated defendant was 19 years old at the time of the offense and had no criminal record. Defendant completed his secondary education at "an academic and therapeutic school with a concentration in meeting the special needs of those students with emotional and behavioral needs." The PSI stated defendant had struggled with symptoms and manifestations of bipolar disorder and attention deficit hyperactivity disorder (ADHD), "which included self harming behaviors, grandiose thrill seeking behaviors and episodes of visual and auditory ideations." Defendant's mother told the probation officer defendant manifested " 'behaviors' " of bipolar disorder and ADHD very early on, and he was first hospitalized for these disorders when he was seven years old. Defendant was " 'in and out of hospitals, displaying self harming behaviors by the third grade.' " Defendant began to reject treatment as he got older. Defendant's mother stated that defendant probably believed he was doing better, but she believed he was not.

¶ 29      Defendant reported he started drinking alcohol regularly when he was 17 or 18 years old. Defendant usually drank in social settings with peers. Defendant said he " 'drank until [he] couldn't drink anymore.' " Defendant said he started using marijuana once a month when he was 17 years old. Defendant also used cocaine approximately twice a month, usually at parties. Defendant's mother and his grandmother told the probation officer that they did not know that defendant used alcohol and drugs.

¶ 30      Defendant's mother reported that defendant had "always been easily led, wanting to please those he took on as friends." Defendant's grandmother said defendant's offense was "a surprise to everyone." Defendant's grandmother reported they "never had any problems out of [defendant], so this is so out of character."

¶ 31      At the sentencing hearing, defendant presented no witnesses, but submitted letters from a former teacher and a family member on his behalf. One of the letters said defendant "desperately tried to fit in and make friends as best he could." The other letter said defendant was easily influenced.

¶ 32      The court sentenced defendant to natural life imprisonment. The court noted that it had no option to give defendant a different sentence because the law mandated that defendant receive a sentence of natural life imprisonment. The court then admonished defendant regarding his appeal rights. The court stated: "You can file a motion to reconsider even though I can't reconsider this sentence." The court then stated that it would file a notice of appeal if defendant wished. Defense counsel said yes.

¶ 33      II. ANALYSIS

¶ 34      A. Ineffective Assistance of Counsel

¶ 35      Defendant argues that his counsel was ineffective in that counsel (1) "raised a baseless defense that [defendant's] recorded statement's inaudible nature constituted reasonable doubt of his guilt despite having stipulated that a transcript of the statement was accurate," and (2) "failed to redact improper other-crimes evidence from the statement." Defendant also argues the cumulative effect of counsel's errors requires reversal. We address each argument in turn.

¶ 36      1. Recorded Statements

¶ 37      Defendant initially argues that his counsel was ineffective for raising "a baseless defense that [defendant's] recorded statement's inaudible nature constituted reasonable doubt of his guilt despite having stipulated that a transcript of the statement was accurate." We find defendant has failed to show he was prejudiced by counsel's alleged deficient performance.

¶ 38      To establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance was deficient and (2) defendant was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to show that a defendant was prejudiced by counsel's deficiencies, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 39      Even if we were to accept defendant's argument that defense counsel performed deficiently in arguing that the inaudible nature of the recorded statement rendered it insufficient to

establish defendant's guilt while stipulating to the accuracy of the transcript, defendant has not shown prejudice. That is, defendant has not shown there is a reasonable probability that the outcome of the trial would have been different absent counsel's "baseless" argument. Significantly, defendant does not argue that the transcript was inaccurate.

¶ 40   Moreover, the State presented ample evidence at trial to prove defendant was guilty of first degree murder—as a principal, regarding the death of Glover, and under a theory of accountability, regarding the death of Rankins. In the recorded statement, defendant stated that he, Miner, Massaro, and McKee planned to rob Rankins. When Glover arrived with Rankins, defendant agreed to "take" one of the victims. Defendant said Miner put Rankins in a chokehold and took him into another room. When Glover tried to aid Rankins, defendant put Glover in a chokehold until he was unconscious. Although defendant said Glover was still breathing when he released him, he indicated Glover was near death. Defendant then held Glover's body while Miner tied him up. When defendant went to check on Rankins, he believed Rankins was dead. After the victims had died, Miner searched their pockets and removed money and marijuana. Defendant, Miner, McKee, and Massaro used the money they found in the victims' pockets to buy alcohol, marijuana, and cocaine, which they all consumed. Several police officers testified to finding the bodies tied up as defendant had described. Arangelovich testified that the cause of death for both Rankins and Glover was strangulation. Arangelovich stated that to die from strangulation, there had to be a constant external obstruction to the neck for 3½ to 6 minutes.

¶ 41                          2. Other-Crimes Evidence

¶ 42   Defendant argues that counsel was ineffective "for failing to redact irrelevant and prejudicial portions of [defendant's] videotaped statement that were improperly admitted as other-crimes evidence." Specifically, defendant objects to the admission of his statements describing how (1) Miner planned to dispose of the victims' bodies by cutting them up and throwing the pieces in the garbage, (2) Massaro and Miner kicked the victims' bodies, (3) McKee struck the victims' bodies with a bottle, and (4) McKee removed items from the victims' vehicle.

¶ 43   Initially, we note that all of the statements that defendant claims were improper concern actions taken by his codefendants rather than by him personally. However, "the concerns underlying the admission of other-crimes evidence are not present when the uncharged crime or bad act was not committed by the defendant." *People v. Pikes*, 2013 IL 115171, ¶ 16. Evidence of bad acts committed by persons other than the defendant should be analyzed "under ordinary principles of relevance." *Id.* ¶ 20.

¶ 44   Even if we were to assume the court would have granted a motion to suppress these portions of defendant's recorded statement on the basis that these acts were irrelevant, defendant was not prejudiced by counsel's alleged error. "[I]n order to establish prejudice under *Strickland*, the defendant must demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15.

¶ 45   In the instant case, defendant has not demonstrated that a reasonable probability exists that the result of his trial would have been different had the evidence of his codefendants' bad acts been suppressed. Defendant confessed to holding Glover in a chokehold until he passed out and later died while Miner did the same to Rankins. Arangelovich testified that the cause of

death for both Rankins and Glover was strangulation. Before defendant and Miner strangled the victims, they discussed a plan to rob them. Miner and defendant carried out this plan after the victims had died. Given this strong evidence of defendant's guilt, it is not reasonably probable that the jury would have reached a different verdict had there been no evidence regarding Miner's plan to dispose of the bodies, Miner and Massaro kicking the bodies, McKee striking the bodies with a bottle, and McKee stealing items from the victims' car.

¶ 46        Defendant also argues that counsel was ineffective for failing to object during closing argument when the prosecutor stated defendant planned to cut the bodies into pieces and put the pieces in dumpsters. Specifically, the State argued:

> "There's a portion in the interview where they're talking about this issue of how they've disposed of the bodies. And this is really telling about who this man is here that is sitting before you.
>
> He said he was going to cut them up in little pieces, a lot of little pieces, and pretty much carve them up like a sandwich and, you know, just grind it down.
>
> You know, you make neat bags and just place it around town, you know, somewhere far. He said, we've got to go somewhere, a distance, and go when it's garbage day, when the garbage is being thrown out, and just place one bag in each one of them, hack them up, and burn the s***. Hack them up like somewhere in the basement, a pile of friggin' meat. And he said that so matter-of-factly."

¶ 47        Defendant correctly notes that he told the police Miner planned to do this rather than him. The prosecutor erred by wrongly attributing this behavior to defendant. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) ("Prosecutors may not argue *** facts not contained in the record."). However, given the strength of the State's evidence, defendant has not shown that there is a reasonable probability that the outcome of the trial would have been different had defense counsel objected to the prosecutor's statement. Significantly, the court instructed the jury that it should disregard any argument made by the attorneys that was not based on the evidence.

¶ 48                                3. Cumulative Error

¶ 49        We reject defendant's argument that the cumulative effect of counsel's errors satisfies the prejudice prong of the *Strickland* analysis. Given the strong evidence of defendant's guilt, defendant has not shown that a reasonable probability exists that the outcome of the trial would have been different but for counsel's errors, even when considered cumulatively.

¶ 50                B. Eighth Amendment and Proportionate Penalties Clause

¶ 51        Defendant argues that the sentencing statute mandating natural life imprisonment (see 730 ILCS 5/5-8-1(c)(ii) (West 2012)) violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. 1, § 11) as applied to him because it did not allow the court to take his youth, social or mental health history, or rehabilitative potential into consideration.

¶ 52        Defendant cites the United States Supreme Court's holding in *Miller v. Alabama*, 567 U.S. 460 (2012), in support of his argument. In *Miller*, the Court held that mandatory life sentences for juveniles violated the eighth amendment's ban on cruel and unusual punishment. *Id.* at 489. Defendant contends that although he was 19 years old at the time of the offense, the holding in

*Miller* should be applied to him because he possessed many of the characteristics that make mandatory life imprisonment an unconstitutionally disproportionate sentence for juveniles. Defendant argues his behavior on the night of the incident showed immaturity, impetuous decision-making, and vulnerability to peer pressure. Defendant also argues that his "mental health issues could have only exacerbated his underdeveloped maturity." Defendant also contends that evidence contained in the PSI showed he had strong rehabilitative potential.

¶ 53    "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *People v. Harris*, 2018 IL 121932, ¶ 39. Consequently, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. "[A] reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121932, ¶ 41 (quoting *People v. Minnis*, 2016 IL 119563, ¶ 19). Thus, " ' "[w]ithout an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." ' " (Internal quotation marks omitted.) *Id.* ¶ 39 (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 26, quoting *People v. Mosley*, 2015 IL 115872, ¶ 47).

¶ 54    In *Thompson*, 2015 IL 118151, ¶¶ 4, 7, the defendant was convicted of first degree murder for an offense that occurred when he was 19 years old and given a mandatory sentence of natural life imprisonment. The defendant argued the statute mandating life imprisonment was unconstitutional as applied to him under the eighth amendment because it did not allow the court to consider his youth. *Id.* ¶ 21. The *Thompson* court held that the defendant forfeited his as-applied constitutional challenge by raising it for the first time on appeal from the dismissal of his petition for relief from judgment. *Id.* ¶ 39. The court reasoned:

> "To support his as-applied challenge, defendant relies exclusively on the 'evolving science' on juvenile maturity and brain development that formed the basis of the *Miller* decision to ban mandatory natural life sentences for minors. Defendant maintains that this science applies with 'equal force' to a criminal defendant who was between the ages of 18 and 21 when the underlying crime was committed. The record here, however, contains nothing about how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge. Nor does the record contain any factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18. Undoubtedly, the trial court is the most appropriate tribunal for the type of factual development necessary to adequately address defendant's as-applied challenge in this case." *Id.* ¶ 38.

¶ 55    The Illinois Supreme Court reached a similar holding in its recent opinion in *Harris*, 2018 IL 121932. In *Harris*, the defendant was 18 years old at the time of his offense and received a mandatory aggregate sentence of 76 years' imprisonment. *Id.* ¶¶ 35-36. The defendant argued that the statutory sentencing scheme mandated a *de facto* life sentence and violated the proportionate penalties clause as applied to him given his youth and other mitigating factors. *Id.* ¶ 36. The supreme court held that defendant's as-applied challenge was premature because he failed to raise it in the trial court. *Id.* ¶ 46. The court reasoned:

> "The record *** includes only basic information about defendant, primarily from the [PSI]. An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as

an adult. As in *Thompson*, the record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." *Id.*

¶ 56 Like in *Thompson* and *Harris*, the record in the instant case is not sufficiently developed to address defendant's as-applied constitutional claim. As in *Harris*, the record contains "only basic information about defendant, primarily from the [PSI]." See *Id.* While the PSI in the instant case discussed defendant's history of mental illness and susceptibility to peer pressure, there was no sworn testimony or factual findings regarding these matters. Also, like in *Thompson* and *Harris*, "the record *** [did] not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." See *Id.*

¶ 57 Similarly, we find that defendant's argument that his counsel was ineffective for failing to raise an as-applied constitutional challenge and failing to present evidence in support of the claim is premature. The record in this case does not disclose what evidence defense counsel could have presented to show how the evolving science on juvenile maturity and brain development could be applied to this case. Accordingly, it is impossible for us to determine whether defendant was prejudiced by counsel's failure to raise this issue or present evidence in support of it. This argument is better suited to postconviction proceedings, where defendant may present any evidence that he believes counsel should have offered in support of an as-applied constitutional challenge to his sentence. See *People v. Cherry*, 2016 IL 118728, ¶ 33.

¶ 58                                    C. Rule 605(a) Violation

¶ 59 Defendant argues that the court failed to properly admonish him as to how to preserve his sentencing claims for review under Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001). Specifically, defendant contends the court erred by stating: "You can file a motion to reconsider even though I can't reconsider this sentence." Defendant argues he was prejudiced by the court's improper admonishment because he could have filed a motion to reconsider, challenging his mandatory sentence of natural life imprisonment on the basis that it was unconstitutional as applied to him. Accordingly, defendant argues we should either address the issue on appeal or remand the matter to give defendant the opportunity to raise the issue in a motion to reconsider sentence and to present evidence in support of it. We have already determined the record is insufficient to address this claim on appeal. We also decline to remand the matter to the trial court, as we believe this issue is more appropriately raised in a postconviction petition.

¶ 60 Rule 605(a) provides that, at the time of imposing sentence, the trial court must advise the defendant:

"[P]rior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant must file in the trial court within 30 days of the date on which sentence is imposed a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing[.]" Ill. S. Ct. R. 605(a)(3)(B) (eff. Oct. 1, 2001).

- 11 -

Rule 605(a) also requires the court to admonish the defendant "that any issue or claim of error regarding the sentence imposed or any aspect of the sentencing hearing not raised in the written motion shall be deemed waived." Ill. S. Ct. R. 605(a)(3)(C) (eff. Oct. 1, 2001). "[W]here a defendant is given incomplete Rule 605(a) admonishments regarding the preservation of sentencing issues for appeal, remand is required only where there has been prejudice or a denial of real justice as a result of the inadequate admonishment." *People v. Henderson*, 217 Ill. 2d 449, 466 (2005).

¶ 61 "[T]he purpose of a motion to reconsider the sentence is not to conduct a new sentencing hearing. Rather, '[t]he purpose of a motion to reconsider a sentence is to allow the trial court an opportunity to review the appropriateness of the sentence imposed and correct any errors made.' " *People v. Vernon*, 285 Ill. App. 3d 302, 304 (1996) (quoting *People v. Root*, 234 Ill. App. 3d 250, 251 (1992)); see also *People v. Burnett*, 237 Ill. 2d 381, 387 (2010) ("The purpose of a motion to reconsider sentence is not to conduct a new sentencing hearing, but rather to bring to the circuit court's attention changes in the law, errors in the court's previous application of existing law, and newly discovered evidence that was not available at the time of the hearing.").

¶ 62 Here, the court erred by failing to give defendant complete admonishments pursuant to Rule 605(a) regarding the filing of a motion to reconsider sentence. However, defendant has not established he suffered prejudice or a denial of real justice as a result. Defendant does not seek remand to file a motion to reconsider arguing that an error occurred in the sentencing hearing, informing the court of changes in the law, or presenting newly discovered evidence—which are claims appropriately raised in a motion to reconsider. *Vernon*, 285 Ill. App. 3d at 304; *Burnett*, 237 Ill. 2d at 387. Rather, defendant seeks to argue for the first time that the sentencing statute is unconstitutional as applied to him and to present evidence in support of this claim. Such an as-applied challenge could have been raised at the original sentencing hearing but was not. We believe that an as-applied constitutional challenge, which would require the presentation of evidence outside the record, is more appropriately raised in postconviction proceedings. *Cherry*, 2016 IL 118728, ¶ 33 ("[T]he Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)) *** specifically allows for the raising of 'constitutional questions which, by their nature, depend[ ] upon facts not found in the record.' " (quoting *People v. Thomas*, 38 Ill. 2d 321, 324 (1967))).

¶ 63                                                        III. CONCLUSION
¶ 64        For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 65        Affirmed.