2021 IL App (2d) 190234-U
No. 2-19-0234
Order filed August 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2764 |
| DEONTAY L. GUNNELL, | ) ) | Honorable John S. Lowry, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The evidence was sufficient to support the trial court's finding that defendant discharged a firearm during the commission of first-degree murder. Defendant's claim that trial counsel was ineffective for failing to argue that his *de facto* life sentence was unconstitutional as applied pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), was premature. Affirmed.

¶ 2  On December 4, 2015, a stray bullet struck and killed Rachael Garrett in her home at 814 Tanner Court in Rockford, Illinois. Defendant, Deontay L. Gunnell, and two other men were charged in connection with the shooting. Following a bench trial, defendant, then 20 years old, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), aggravated discharge

of a firearm (720 ILCS 5/24-1(a)(2) (West 2014)), and mob action (720 ILCS 5/25-1(a)(1) (West 2014)). The trial court also found that defendant personally discharged a firearm during the commission of the crime, requiring a 20-year enhancement to be added to his first-degree murder sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2014). The trial court sentenced defendant to 51 years' imprisonment. On appeal, defendant contends: (1) the trial court erred in finding that he personally discharged a firearm during the commission of the crime, and (2) trial counsel provided ineffective assistance by failing to argue that defendant's *de facto* life sentence was unconstitutional as applied to him. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4      Following the shooting death of the victim, defendant and two other men—Lonnie Williams and Donnie Williams—were charged in connection with the shooting. Defendant filed a motion to sever his charges from those of his co-defendants, which the trial court granted. Defendant waived a jury trial, and a bench trial was held in October 2018. We recount the evidence relevant to this appeal.

¶ 5                              A. The Trial

¶ 6      Defendant began dating Ashley Horan prior to the shooting. Approximately two weeks before the shooting, defendant and Horan purchased a maroon Pontiac Grand Prix. The car was registered to Horan, but both she and defendant drove it.

¶ 7      Several witnesses testified that, at approximately 4:00 p.m. on December 4, 2015, a shooting took place in the area of 814 Tanner Court. Alexandria Bergeson and Lever Steward each testified that a group of people was standing near 814 Tanner Court and that they heard five or six gunshots in the area. Bergeson said she saw "four or five guys," while Steward said he was present with a group of seven or eight people. Steward, Keith Collins, and Jacquez MacDaniel each

testified that they saw a red Pontiac Grand Prix in the area. Steward said that the car had dark windows and that he heard shots and saw the car speed off. Collins said that the car had tinted windows and a temporary license plate, and that he saw the rear door open followed by a flash and gunshots fired in the direction of 814 Tanner Court. MacDaniel said that he saw somebody in the car open a door and start shooting. Further, Collins and MacDaniel each testified that they later met with a detective who showed them photos of the Grand Prix registered to Horan. Collins had indicated that it was the same vehicle he had seen during the shooting, while MacDaniel had indicated that "[i]t could be the car" he had seen during the shooting. Two nearby surveillance cameras captured images of a red Pontiac in the area around the time of the shooting.

¶ 8    Ashley Horan testified that she picked up defendant at approximately 5:00 p.m. on December 4, 2015, and drove him to Swedish American Hospital, where defendant was treated for a gunshot wound. The Grand Prix was missing, so she drove her other car. Although she had initially lied to detectives about where she picked up defendant, Horan testified that she picked him up on 25th Street.

¶ 9    The following morning, defendant appeared at Horan's home and she overheard him making phone calls. Horan testified she heard him say that "he was involved with a shooting," "it was over on Tanner," and "he was shooting." Horan and defendant then had a short conversation "[a]bout the shooting" in which defendant said he was with Lonnie and Donnie Williams at the time but did not say where he went the day of the shooting. Defendant also told Horan that the Grand Prix "had been shot up" and asked Horan to have it repaired. Horan further testified that she eventually picked up the Grand Prix "somewhere off Sixth" and noticed "[t]hat it had a bunch of bullet holes" and glass in the interior.

¶ 10    Later during direct examination, the State asked Horan about a prior written statement she had given to police:

"[MR. CARDER (ASSISTANT STATE'S ATTORNEY):] I'm gonna show you now People's Exhibit 98. That's your written statement, correct?

A. Yes.

Q. And earlier I had asked you some questions about, um, where the defendant said he went that day; specifically, the day of the shooting, 12/4/2015. Do you recall me asking that question?

A. Yes.

Q. And I think your question—your answer was 'I don't recall,' is that correct?

A. I believe so.

Q. When you met with detectives—and directing your attention to the second page, fourth paragraph from the bottom, does it say in part that ' "[defendant]" then told me he went with Lonnie and Donnie to Avon Street . . .'? Does it say that in part?

A. Yes.

Q. All right. And did—does it also say that 'He said there was like 15 [to] 20 people standing outside and they started shooting at the car, so he had to shoot back and got shot on Tanner'?

A. Yes.

Q. Does it also say, 'It didn't sound like he was the one driving my car at the time of the shooting'?

A. Yes."

Horan also testified that she did not see the Grand Prix when she picked up defendant on December 4, 2015.

¶ 11    On cross-examination, Horan admitted that she did not know when the shootout on Tanner occurred:

> "[MR. PERRI (DEFENSE ATTORNEY):] When you say there was a big shootout on Tanner, it doesn't necessarily mean that it happened on the 4th of December, 2015. He never said that to you. Correct?
>
> A. Correct.
>
> Q. So it could have been some other date than December the 4th, 2015; correct?
>
> A. It's possible."

Defense counsel further asked Horan to clarify what defendant meant when he told her about the shooting he was involved in:

> "[MR. PERRI (DEFENSE ATTORNEY):] Mr. Gunnell indicated to you there were 15 to 20 people. What—what are you referring to in the statement in respect to the 15 to 20 people? Where were they located?
>
> THE COURT: As related by Mr. Gunnell.
>
> [DEFENSE ATTORNEY:]  As related by Mr. Gunnell.
>
> A. From what I know, it was on, uh, Tanner."

¶ 12    On redirect examination, Horan further testified that the Grand Prix had never been shot at before December 4, 2015.

¶ 13    Rockford police discovered three fired cartridge casings at the scene of the shooting. Rockford police officer Joshua Arthur testified that he found the casings at the intersection of Tanner Court and Maple Street, while Rockford police officer Vince Kelly photographed and

collected the casings. Rockford police detective Bruce Voyles inspected the victim's apartment. He observed a hole in the interior wall that lined up with a hole in the exterior wall. The damage was consistent with a bullet projectile. By placing a ballistic rod through the hole, Voyles determined the trajectory of a projectile that would have penetrated the wall and caused the damage. Based on the trajectory, Voyles testified that the holes could have been caused by a bullet fired from the area where the shell casings were discovered.

¶ 14    Rockford police officers Gary Kiely and Daniel Scharlau testified that they arrested Lonnie and Donnie Williams at approximately 9:10 p.m. on December 4, 2015, following a traffic collision. Lonnie was driving and, while being followed by Kiely, ran a red light and struck another car. The officers observed and recovered a silver revolver and a black .45 semiautomatic handgun from the vehicle.

¶ 15    Two Illinois State Police (ISP) forensic scientists testified about tests they performed on the black handgun. Blake Aper testified that he tested the gun for DNA and obtained a two-person mixture, identifying a major contributor and a minor contributor. The major contributor matched the DNA profile of either Lonnie or Donnie Williams. He explained that because the brothers are identical twins, he was unable to determine which one left the DNA. The minor contributor could not be identified because the profile was "too partial" to make a comparison.

¶ 16    Julie Steele testified that she compared the fired cartridge casings recovered from the scene of the shooting with each other and with a fired cartridge casing from the black handgun during a test firing. The crime scene casings all came from .45 bullets and had markings that matched each other as well as the casing obtained from the test firing. Thus, Steele concluded that the crime scene casings were fired from the black handgun she tested. Steele also examined the bullet recovered from the victim's body and compared it with the bullet obtained from the test firing. She

concluded that the bullet recovered from the victim was also fired from the black handgun she tested.

¶ 17    The State called Shakeda Barfield, who testified that she could not remember anything that happened on December 4, 2015. The State proceeded to question her about a signed, written statement she had given to police on December 16, 2015, as well as a signed photo array bearing the same date. In the statement, Barfield described being approached by a man on December 4, 2015, who resembled defendant. The man brandished a black handgun and threatened a man who was with Barfield at the time. On the photo array, defendant's picture was circled, with a signature, initials, date, and time indicated in the circle. Barfield acknowledged the signature was hers. Footage from a nearby surveillance camera depicted the interaction described in the statement occurring just before 3:00 p.m. on December 4, 2015.

¶ 18    The State also called Rockford police detective James Gulley, who conducted the December 16, 2015, interview with Barfield. Gulley testified that he met with Barfield, who identified defendant in a photo array, and that their interaction was recorded. The State then published both the recorded interview and the signed photo array.

¶ 19    After the State rested, defendant moved for a directed finding, and the trial court denied the motion. Defendant did not testify.

¶ 20                          B. The Court's Findings

¶ 21    The trial court made the following findings. First, it found Horan's testimony to be credible. It considered any potential interest, bias, or motive she may have had, but it noted that her testimony was consistent with the other evidence and that she was "straightforward and responsive" to questions. Second, the State presented insufficient evidence that defendant was the shooter of the bullet that killed the victim. Third, the State presented sufficient evidence that

defendant was responsible for the victim's death under the doctrines of accountability and transferred intent. Fourth, the State proved beyond a reasonable doubt that defendant committed the offenses of mob action and aggravated discharge of a firearm (under the accountability theory). Finally, the State proved beyond a reasonable doubt that defendant had personally discharged a firearm during the commission of the offense, based primarily on Horan's testimony about the December 5, 2015, conversation she overheard, in which defendant told another person he had been involved in a shooting.

¶ 22    The trial court thus found defendant guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), aggravated discharge of a firearm (720 ILCS 5/24-1(a)(2) (West 2014)), and mob action (720 ILCS 5/25-1(a)(1) (West 2014)). Defendant filed a motion for a new trial, which the trial court denied.

¶ 23                                C. Sentencing

¶ 24    At the sentencing hearing, the trial court found that a firearm enhancement was applicable to defendant's first-degree-murder conviction, requiring an additional 20 years to be added to his sentence. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2014). The court also found that mandatory consecutive sentencing was required for defendant's first-degree murder conviction. See 730 ILCS 5/5-8-4(d)(1) (West 2014).

¶ 25    The trial court heard argument from the State and from defendant on factors in aggravation and mitigation. Trial counsel for defendant made no argument with respect to the constitutionality of imposing a *de facto* life sentence. Rather, he urged the trial court to impose the minimum aggregate sentence, which was 44 years. In relevant part, the court made the following observations regarding mitigating factors. First, due to defendant's criminal history, the court could not find that defendant was unlikely to reoffend. Next, the pretrial service report did not

indicate defendant would experience any hardships such as a medical condition. The court found "that there is rehabilitative potential, to an extent" given defendant's relationships with family, his desire to further his education, and his being "a bright young man." It then noted defendant's age, indicating that "the Court gives consideration and weight to that in a mitigating manner." The court found that defendant's character and attitude toward criminal behavior were "mixed." Finally, it stated, "The court is mindful, in mitigation, the defendant did not have a strong home life," noting that "[t]he mother of the defendant did not supervise educational activity" and "[t]he father was not around in the childhood years."

¶ 26 The trial court sentenced defendant to 26 years for his first-degree murder conviction, to be served at 100% (730 ILCS 5/3-6-3(a)(2)(ii) (West 2014)), with a 20-year enhancement; 5 years for his aggravated-discharge-of-a-firearm conviction, to be served consecutively at 85% (*id.* § 3-6-3(a)(2)(iii)); and 3 years for his mob action conviction, to be served concurrently (with the aggravated-discharge-of-a-firearm sentence) at 50% (*id.* § 3-6-3(a)(2.1)). Thus, defendant was given an aggregate sentence of 51 years' imprisonment.

¶ 27 Defendant filed a motion to reconsider sentence, which the trial court denied. Trial counsel for defendant again made no argument with respect to the constitutionality of defendant's sentence. This timely appeal followed.

¶ 28                                   II. ANALYSIS

¶ 29 On appeal, defendant raises two arguments: (1) the trial court erred in finding beyond a reasonable doubt that defendant discharged a firearm during the commission of the offense, and (2) trial counsel was ineffective for failing to argue that his *de facto* life sentence was unconstitutional as applied.

¶ 30          A. Sufficiency of the Evidence that Defendant Discharged a Firearm

¶ 31    Defendant first contends that the trial court erred when it found that he personally discharged a firearm during the commission of the offense, rendering the 20-year firearm enhancement improper.

¶ 32    Where the sufficiency of the evidence is challenged on appeal, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the disputed element beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64. A reviewing court will not substitute its own judgment for that of the trier of fact with regard to the weight of the evidence or witness credibility. *Id.* To set aside a finding, the evidence must be so improbable or unsatisfactory as to create a reasonable doubt. *Id.*

¶ 33    Defendant argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he discharged a firearm. Importantly, defendant does not challenge his underlying conviction for first-degree murder, for which the trial court found defendant guilty based on a theory of accountability. Nor does defendant dispute that he was present at the scene of the murder. Rather, defendant attacks the trial court's reliance on  Horan's testimony about several inculpatory statements made by defendant following the shooting. Specifically, defendant claims that Horan's testimony "lacked sufficient objective facts and was undercut by her admission that at the time she provided her written statement to police, she was afraid of being implicated in the shooting and was fearful that she might be sentenced to prison and lose custody of her child." In sum, defendant insists that Horan's testimony was unreliable.

¶ 34    Here, the trial court expressly stated that it found Horan's testimony credible. The court indicated that it considered potential bias and noted that Horan's testimony was consistent with the other evidence. After reviewing the trial record, we cannot say that this conclusion is so improbable or unsatisfactory as to create a reasonable doubt. Defendant cross-examined Horan on

her potential bias and past inconsistent statements. The court nevertheless found Horan credible, and we have no reason to disagree.

¶ 35   Given that the trial court found Horan's testimony to be credible, its finding that defendant personally discharged a firearm was reasonable. The court based its finding largely on Horan's testimony. The shooting took place on December 4, 2015. Horan testified that she picked up defendant shortly after the shooting. Defendant had sustained a gunshot wound, and Horan drove him to the hospital.

¶ 36   The following day, Horan overheard a conversation between defendant and an unknown individual during which defendant said that "he was involved with a shooting," "it was over on Tanner," and "he was shooting." Horan and defendant then had a short conversation "[a]bout the shooting" in which defendant said he was with Lonnie and Donnie Williams at the time. When asked about a prior statement to police, Horan acknowledged that she had told police that defendant had told her he was involved in a shooting involving a group of 15 to 20 people. Specifically, the group started shooting at him, so he had to shoot back, and was shot on Tanner. She also related that it did not seem like defendant was driving at the time of the shooting. On cross-examination, Horan admitted that defendant did not tell her the shooting he described had occurred on December 4, 2015.

¶ 37   Other evidence was consistent with Horan's testimony. Two witnesses testified that a group of people was present on Tanner at the time of the shooting, which was at least partially consistent with defendant's discussion of a shooting involving a group of 15 to 20 people. Defendant told Horan that he was shot, and fired a gun himself, during the encounter with that group. When Horan picked up defendant shortly after the shooting, defendant had sustained a gunshot wound. One witness identified defendant as a man who had threatened her boyfriend with a black handgun

shortly before the shooting. ISP investigators testified that bullet casings recovered from the scene of the shooting were linked to a black handgun recovered from the Williams brothers' car. Further, one witness testified that he saw gunshots fired from the rear seat of the Grand Prix on Tanner, while Horan had told police her understanding was that defendant was not driving at the time he was shot. This supports an inference that defendant fired a gun from the rear seat of the Grand Prix on Tanner during the December 4, 2015, shooting. Finally, the Grand Prix was recovered by Horan and observed to have new damage consistent with gun shots. Taken together, we conclude that a rational trier of fact could have found that defendant was talking about the December 4, 2015, shooting on Tanner when Horan overheard him on the telephone discussing shooting a gun.

¶ 38    Viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could find that defendant discharged a firearm during the December 4, 2015, shooting that left Rachael Garrett dead. Accordingly, the evidence was sufficient to prove beyond a reasonable doubt that defendant discharged a firearm during the murder. Thus, the trial court did not err in finding that the 20-year firearm enhancement applied.

¶ 39                    B. Ineffective Assistance of Counsel

¶ 40    Defendant maintains that trial counsel was ineffective for not arguing at sentencing that, as applied to him, the aggregate mandatory minimum sentence he faced violated both the proportionate-penalties clause of the Illinois Constitution and the eighth amendment of the United States Constitution. See Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."); U.S. Constitution, eighth amendment (prohibiting "cruel and unusual punishment"). Specifically, defendant argues that though he was an adult at the time of the offense, he was young enough that trial counsel should have presented evidence showing how the evolving science on

juvenile maturity and brain development rendered the mandatory minimum 44-year sentence unconstitutional. Accordingly, defendant asks us to vacate his sentences and remand the matter for resentencing.

¶ 41 The State counters that the record is not sufficiently developed to consider defendant's ineffective assistance of counsel claim on direct appeal and, in the alternative, that defendant's aggregate mandatory minimum sentence violated neither the proportionate-penalties clause nor the eighth amendment.

¶ 42 To prevail on a claim of ineffective assistance of counsel at sentencing, a defendant must show that (1) counsel's performance fell below minimal professional standards and (2) a reasonable probability exists that his sentence was affected by the substandard performance. *People v. Steidl*, 177 Ill. 2d 239, 257 (1997); see also U.S. Const., amends. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). Failure to establish either prong negates a claim of ineffective assistance of counsel. See *Strickland*, 466 U.S. at 691-92. We review *de novo* a claim of ineffective assistance of counsel raised for the first time on appeal. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. As set forth below, we conclude that defendant cannot show the requisite prejudice under *Strickland*.

¶ 43 We begin our analysis with the eighth amendment's prohibition of "cruel and unusual punishments," applicable to the states through the fourteenth amendment. U.S. Const. amend. VIII; *People v. Davis*, 2014 IL 115595, ¶ 18. Applying the eighth amendment's ban on "cruel and unusual punishments" to juvenile sentences, the United States Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), held that the imposition of a mandatory sentence of life without the possibility of parole for a juvenile offender, without consideration of the defendant's youth and its attendant characteristics, violates the eighth amendment's ban on cruel and unusual

punishment. *Id.* at 479-80, 489.

¶ 44    Accordingly, *Miller* and its progeny have provided that before a juvenile offender may be sentenced to life imprisonment without parole, the trial court must consider the juvenile's "youth and its attendant characteristics" and find his or her conduct "showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. In *People v. Reyes*, 2016 IL 119271, our supreme court extended *Miller,* holding that sentencing a juvenile offender to a mandatory term of years that is the functional equivalent of life without the possibility of parole, a *de facto* life sentence, constitutes cruel and unusual punishment in violation of the eighth amendment. *Id.* ¶ 9. In *Holman*, our supreme court again extended *Miller* claims to include not just juvenile mandatory *de facto* life sentences, but also juvenile discretionary *de facto* life sentences. *Holman*, 2017 IL 120655, ¶ 40.

¶ 45    Our supreme court in *People v. Buffer*, 2019 IL 122327, considered what constitutes a *de facto* life sentence and drew the line at 40 years, concluding that such "a prison term is long enough to be considered *de facto* life without parole." *Id.* ¶ 40.  We observe that the mandatory minimum period of incarceration defendant faced for the charges he was convicted of was 44 years. The sentencing range for first degree murder is 20 to 60 years (730 ILCS 5/5-4.5-20(a) (West 2014)); the trial court found that a mandatory 20-year firearm enhancement applied (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2014)); and the sentencing range for aggravated discharge of a firearm is 4 to 15 years (730 ILCS 5/5-4.5-30(a) (West 2014), required to be served consecutive to his first-degree murder sentence (730 ILCS 5/5-8-4(d)(1) (West 2014)). Thus, the minimum aggregate sentence defendant could have received was 44 years which, were defendant a juvenile, would be a *de facto* life sentence under *Buffer*.

¶ 46 Operating in parallel to the eighth amendment, the proportionate penalties clause of the Illinois Constitution, Ill. Const., art. I, § 11, prohibits punishment that "is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Proportionality is determined in view of "the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340. The proportionate penalties clause and the eighth amendment "are generally read coextensively." *People v. Cavazos*, 2020 IL App (2d) 120171-B, ¶ 18 n.1. However, "[a]lthough a relationship may exist between the [proportionate penalties clause] and the eighth amendment, that relationship is not entirely clear. What is clear is that the limitation on penalties set forth in the [proportionate penalties clause], which focuses on the objective of rehabilitation, went beyond the framers' understanding of the eighth amendment and is not synonymous with that provision." *People v. Clemons*, 2012 IL 107821, ¶ 40.

¶ 47 Pertinent to defendant's claims, our supreme court in *People v. Thompson*, 2015 IL 118151, and *People v. Harris*, 2018 IL 121932, has suggested that a young adult offender may bring "as applied" challenges seeking *Miller* protections. In *Thompson*, the court considered whether the defendant's as-applied eighth amendment and proportionate penalties clause challenges to his sentence were procedurally barred or forfeited because the defendant raised them for the first time on appeal from the dismissal of his 2-1401 petition. 735 ILCS 5/2-1401 (West 2010); *Thompson*, 2015 IL 118151, ¶ 25. In his appeal the defendant, who was 19 at the time of his offense, requested that the rationale of *Miller* be extended beyond juveniles, to young adults. *Id.* ¶ 17. While affirming the appellate court's decision that the defendant could not raise his as-applied constitutional challenges for the first time on appeal, the court observed that the defendant "[was] not necessarily foreclosed from renewing his as-applied challenge in the circuit

court" in a postconviction proceeding, though the court "express[ed] no opinion on the merits of any future claim[.]" *Id.* ¶ 44; see also 725 ILCS 5/122-1 *et seq.* (West 2020) (Post-Conviction Hearing Act).

¶ 48    In *Harris*, our supreme court similarly suggested the possibility of extending *Miller* protections to young adults under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). *Harris*, 2018 IL 121932, ¶¶ 34-61. The defendant in *Harris* was just over 18 years of age at the time of the offense and was convicted of first-degree murder and other offenses that carried a mandatory minimum aggregate term of 76 years imprisonment. *Id.* ¶ 1. The defendant appealed his sentence raising an as-applied challenge under the proportionate penalties clause and a facial eighth amendment challenge. *Id.* ¶¶ 37, 53.

¶ 49    The court initially noted the "critical" distinction between facial and as-applied challenges. "A party raising a facial challenge must establish that the statute is unconstitutional under any possible facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party. [Citations.] All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶¶ 38-39. " 'Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " *Id.* ¶ 39 (citing *People v. Hartrich,* 2018 IL 121636, ¶ 31). The court then reiterated that, "A court is not capable of making an 'as-applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as-applied' is premature." (Internal quotation marks omitted.) *Id.* (quoting *People v. Rizzo*, 2016 IL 118599,

¶ 26).

¶ 50    Considering then the defendant's as-applied challenge under the proportionate penalties clause, the *Harris* court explained that because the defendant's as-applied claim was not raised in the trial court and he was a young adult such that "*Miller* does not apply directly to his circumstances[,]" the record needed to "be developed sufficiently to address defendant's claim that *Miller* applied to his particular circumstances." *Id.* ¶¶ 45-48. The court declined to remand the matter for an evidentiary hearing and, as in *Thompson*, stated the defendant's claim could more appropriately be brought in a proceeding under the Post-Conviction Hearing Act which allows for consideration of constitutional questions based on facts not found in the record. *Id.* ¶ 48.

¶ 51    The *Harris* court then turned to the defendant's eighth amendment facial challenge contending that the protections for juveniles recognized in *Miller* should be extended to young adults.  The court disagreed, stating, "[F]or sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly, defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails." *Id.* ¶ 61.  The court further stated, however, that "[t]o the extent that defendant may have intended to raise an as-applied challenge under the eighth amendment, that claim would fail for the same reason his challenge under the Illinois Constitution failed, because no evidentiary hearing was held and no findings of fact were entered on how *Miller* applies to him as a young adult." *Id.* ¶¶ 52-53.  Though arguably *dicta*, this latter statement by the court at least implicitly suggests the possibility that young adults can present as-applied eighth amendment claims that the *Miller* protections apply to them.

¶ 52    Notwithstanding, we reach neither defendant's as-applied proportionate penalties or eighth amendment claims; as in *Thompson* and *Harris,* the underlying record is insufficiently developed

to address defendant's claim that *Miller* applied to his particular circumstances. See also *People v. Landerman*, 2018 IL App (3d) 150684 (young adult offenders' ineffective assistance claims premature where record undeveloped as to applicability of *Miller*); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 57 (following *Harris* and finding that an as-applied proportionate penalties challenge was premature); *People v. Figueroa*, 2020 IL App (2d) 160650 (young adult offenders' argument on appeal premature where record undeveloped as to applicability of *Miller*); but *cf. People v. House,* 2019 IL App (1st) 110580-B, ¶ 25, *appeal allowed,* 140 N.E.3d 231 (Ill. 2020) (holding trial record sufficiently developed and granting young adult offender's as-applied proportionate penalties challenge under *Miller*). Here, defendant's trial counsel did not argue that the mandatory minimum possible sentence violated either the Illinois proportionate penalties clause or the eighth amendment as applied to defendant. Nor did trial counsel present any expert testimony or argue the *Miller* factors in support of *Miller's* application to defendant's circumstances. Rather, he merely asked the trial court to take defendant's relative youth and rehabilitative potential into consideration and asked the court to impose the minimum sentence permitted by statute.

¶ 53    The presentence report did provide some basic biographical information as recounted by the court, including that defendant lacked a "strong home life," his mother "did not supervise educational activity," and his father was not present throughout his childhood. However, "[B]asic information about [the] defendant, primarily from the presentence report," is not enough; rather, the record must show that the trial court made "findings on the critical facts needed to determine whether *Miller* applies to [the] defendant." *Harris*, 2018 IL 121932, ¶ 46. "A court is not capable of making an 'as-applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute

is unconstitutional 'as applied' is premature." (Internal quotation marks omitted.) *Id.* ¶¶ 38-39 (quoting *People v. Rizzo*, 2016 IL 118599, ¶ 26).

¶ 54 Anticipating that this court might find the approach in *Harris* and the other cases discussed above persuasive, defendant asks us to instead presume prejudice based upon trial counsel's failure to raise an as-applied constitutional challenge to the mandatory minimum sentence. In support he cites *Roe v. Flores-Ortega*, 528 U.S. 470, 483-84 (2000) (holding that prejudice can be presumed where a defendant can show that, but for counsel's deficient failure to consult him about an appeal, there is a reasonable probability he would have timely appealed). See also *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (holding that prejudice requirement can be satisfied where a defendant can show that, but for counsel's errors, there is a reasonable probability he would not have pleaded guilty and instead gone to trial). Defendant essentially argues that trial counsel's deficiency in raising an as-applied *Miller* challenge rendered his sentencing proceeding "presumptively unreliable or entirely nonexistent." *Flores-Ortega,* 528 U.S. at 484. Given the uncertainty as to whether defendant's circumstances would accord with the *Miller* factors and, if so, whether a young adult offender can make an as-applied *Miller* challenge in the first place, we decline to presume prejudice in this context.

¶ 55 As the record is not sufficiently developed for us to determine whether defendant was prejudiced by trial counsel's failure to make the as-applied constitutional challenges he argues on appeal, we deny defendant's ineffective assistance claim as premature. Consistent with *Thompson* and *Harris,* we do not intend for our disposition to preclude defendant from advancing his as-applied claims in a postconviction proceeding, though we express no opinion as to the merits of any future claim. See *Thompson*, 2015 IL 118151, ¶ 44; see also 725 ILCS 5/122-1 *et seq.* (West 2020) (Post-Conviction Hearing Act).

¶ 56                                   III. CONCLUSION

¶ 57    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 58    Affirmed.