NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250086-U

NO. 4-25-0086

IN THE APPELLATE COURT

FILED
June 1, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| LARRY D. MCCLAIN JR., | ) | No. 22CF151 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Ryan M. Cadagin, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding:

(1) Trial counsel affirmatively acquiesced to the admission of codefendant's jailhouse calls and defendant did not establish counsel was ineffective for failing to object to the jailhouse calls or to move to sever the trials.

(2) Trial counsel affirmatively acquiesced to the admission of the certifications of authenticity for the cell phone records.

(3) Trial counsel's failure to object to the qualifications and testimony of two police detectives did not deprive defendant of the effective assistance of counsel.

(4) The trial court did not abuse its discretion in allowing the prior consistent statement of a State's witness, and there is no reasonable probability the outcome of the trial would have been different had the jury been given a limiting instruction for the statement.

(5) Defendant forfeited his argument as to the admission of other-crimes evidence, and he did not establish trial counsel provided deficient representation for failing to request a limiting instruction for that evidence.

(6) The prosecutor's comments in closing argument did not constitute prosecutorial misconduct, defeating defendant's claims of plain error and ineffective assistance of counsel.

(7) The record is insufficient to address defendant's proportionate penalties clause claim as to his sentence and his ineffective assistance claim is premature.

¶ 2 Following a September 2024 trial, a jury found defendant, Larry D. McClain Jr., guilty of (1) the first degree murders of Bryant Williams, Savante English, and Keyera Gant (720 ILCS 5/9-1(a)(1), (2), (3) (West 2020)), (2) armed robbery (*id.* § 18-2(a)(1)), and (3) armed violence (*id.* § 33A-2). Thereafter, the trial court sentenced defendant to a mandatory life sentence for the first degree murder convictions, to run concurrently with a 30-year sentence for the armed violence conviction. The armed robbery conviction merged into the first degree murder convictions for sentencing.

¶ 3 On appeal, defendant argues (1) he was denied a fair trial because of the improper admission of jailhouse call recordings, certifications of authenticity, cell phone records, expert testimony, and other-crimes evidence; (2) he was denied the effective assistance of counsel for failing to object to or request a limiting instruction for the evidence at issue; (3) the trial court abused its discretion in allowing a prior consistent statement and other-crimes evidence; (4) he was denied a fair trial when the State made improper comments during closing argument, and counsel was ineffective for failing to object; and (5) his sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). For the following reasons, we affirm.

¶ 4 I. BACKGROUND

¶ 5 In March 2022, a grand jury indicted defendant on nine counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2020)), one count of armed robbery (*id.* § 18-2(a)(1)), one count of armed violence (*id.* § 33A-2), one count of unlawful possession of a

weapon by a felon (*id.* § 24-1.1)), possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)), and two counts of obstructing justice (*id.* § 31-4(a)(1)). The indictment alleged, on August 9, 2021, defendant, along with codefendants Kelton Galmore and Joseph Hembrough, while armed, went to the home of English, located at 2517 South 10th Street in Springfield, Illinois, with the intent of committing a theft against Williams. While inside the home, they shot and killed Williams, English, and Gant and stole money and drugs from Williams.

¶ 6 In June 2024, defendant filed a motion to sever his trial from Hembrough's based on Hembrough's confession directly implicating defendant. Defendant did not move to sever his trial from Galmore's. In August 2024, the State filed a motion *in limine* to admit the testimony of Michael Pullings. The motion alleged Pullings would testify, on October 27, 2021, he was incarcerated with Hembrough. Hembrough told Pullings that he and two other individuals participated in a drug-related robbery in Springfield and the other two individuals shot and killed the three victims. Hembrough also told Pullings he left behind a magazine from his gun at the scene.

¶ 7 At a September 2024 pretrial hearing, the motion to sever was withdrawn after Hembrough pleaded guilty and agreed to testify against defendant. The trial court reserved ruling on the State's motion *in limine* regarding Pullings's testimony, including whether the testimony could come in as a prior consistent statement of Hembrough's.

¶ 8 A. Jury Trial

¶ 9 In September 2024, the matter proceeded to a jury trial. The following evidence was adduced at trial.

¶ 10 On August 8, 2021, a party was held at 2517 South 10th Street. The party was attended by several individuals, including Shyra Daniel, Nashaya Wilson, Michael Smith,

- 3 -

Jamika Harris, Jabborah Harris, Davosia Whiteside, Williams, Gant, and defendant. During police interviews with these individuals, it was revealed defendant was a light-skinned Black male who went by the nicknames "Junior" and "White Boy."

¶ 11                                          1. *Smith*

¶ 12          Smith testified he attended a party at 2517 South 10th Street on August 8, 2021. Smith testified he knew Williams was a drug dealer and was in possession of large sums of money, and there were drugs at English's home. Smith indicated defendant was at the party, but Smith never saw him because Smith was asleep for most of it. The State asked Smith if he told the police he saw defendant in possession of a firearm. Smith answered, "Yes. Not, not at the party—not that house. I never said [defendant] had possession of a firearm at the house. I never seen him at the house." The State asked Smith to clarify when he saw defendant in possession of a firearm. Defense counsel objected, and the State withdrew the question. Smith recalled telling the police he saw defendant in possession of a Glock 9-millimeter pistol.

¶ 13          After the party, the group went to an IHOP restaurant. Smith and Whiteside then went to the home of Aaliyah Flakes, where they remained for the rest of the night. Flake's police interview and surveillance video from the area corroborated Smith and Whiteside were at Flakes's home during the time the homicides occurred. Smith learned of the murders when LaQuintae Brewer called and told him the next day. On cross-examination, Smith reiterated he was asleep the entire time defendant was at the party.

¶ 14          On redirect examination, the State asked Smith if he recalled telling the police "that you saw [defendant] showing the firearm, that's how you knew what it was?" Defense counsel objected, and the trial court overruled it. Smith testified he remembered telling the police he saw defendant showing a firearm.

¶ 15		On recross-examination, the following exchange occurred between defense counsel and Smith:

> "Q. And you didn't tell the cops that [defendant] had a gun at the party, right?
>
> A. No.
>
> Q. You told the cops that you'd seen [defendant] with a gun on some other occasion, right?
>
> A. Yeah.
>
> Q. The questions he just asked you about this gun that you saw, was this the gun that you saw on some other occasion?
>
> A. Yeah. Always see. He always had a gun on him.
>
> Q. But not—you didn't see—
>
> A. I didn't see it that night, no."

¶ 16		Defense counsel had no further questions, and Smith stepped down from the stand. Outside the presence of the jury, counsel expressed his concern the State's redirect examination elicited other-crimes evidence that depicted defendant as someone who always had a gun. Counsel noted defendant's objection on this point was sustained during direct examination. The trial court determined the earlier objection was resolved when the State withdrew its question, and Smith's later testimony was not a product of the State's direct examination.

¶ 17		2. *Latravian Medley*

¶ 18		Latravian Medley testified he went to 2517 South 10th Street after Williams did not answer his phone. He went in the house and discovered the bodies of Williams and English.

He was on the phone with Brewer and told him what he saw. Brewer came over to the house, and neither person called the police. Surveillance video obtained by the police showed Medley's and Brewer's vehicles in the area of the crime scene the morning after the homicides.

¶ 19                                    3. *Shunderika Price*

¶ 20        Shunderika Price testified she was Williams's fiancée. After she was unable to get in contact with Williams, Price went to 2517 South 10th Street. She knocked on the front door, but there was no response. Price walked around to the back door and saw Williams's red Dodge Charger in the backyard with a broken window. (We note the vehicle is referred to as both a Dodge Challenger and a Dodge Charger in the record.) She entered the home after finding the back door was open. She found English lying on the kitchen floor and Williams on the dining room floor, both with gunshot wounds. Price stated the home was "messed up" and "filthy," which was not normal for the home. After calling 911 to report what she saw, Price walked into one of the bedrooms, where she found Gant up against a wall with gunshot wounds.

¶ 21                                    4. *Crime Scene Evidence*

¶ 22        Brian Crolly testified he was a patrol officer with the Springfield Park District Police Department in August 2021. Crolly was the first officer to arrive on the scene. He did not observe any signs of forced entry, and the front door was locked. He saw multiple cartridge cases on the ground next to the bodies. The house was in disarray, with the cabinets in the kitchen left open and items thrown around the house.

¶ 23        Lori White testified she was a crime scene detective with the Springfield Police Department (SPD) in August 2021. White took photographs and scans of the scene depicting the following. In the back of the house, there were muddy tire tracks and a footwear impression. Another picture showed Williams's red Dodge Charger with a broken driver's side window. In

the kitchen, there were open cabinets and drawers. To the left side of English's body, there was a mop and bucket, a bottle of bleach, and three spent cartridge cases. In the dining room, there was a fully loaded magazine next to Williams's head and spent cartridge cases next to his body. There were no suitable fingerprints for testing on the magazine or the ammunition in the magazine. On the dining room table, there was a digital scale with some white residue, a glass jar with green plant material, and two boxes of sandwich baggies. Later testing determined one fingerprint on the glass jar matched Whiteside and four prints matched defendant. No other fingerprints at the scene matched defendant. A Snapchat video recovered from English's cell phone, recorded at 6:57 p.m. on September 8, 2021, showed defendant sitting at the dining room table. Other pictures and videos from the party showed defendant handling the glass jar.

¶ 24    White recovered 5 spent cartridge cases in the kitchen, 11 spent cartridge cases in the living room and dining room area, 5 spent cartridge cases in the bedroom, and 4 fired bullets. All the cartridge cases were determined to be 9-millimeter Luger cases. Later testing revealed the cartridge cases were fired from two different firearms. Four of the five cartridge cases from the bedroom and eight cartridge cases from the dining room came from one gun, while the remaining cartridge cases were fired from another gun.

¶ 25    White also collected DNA swabs from numerous surfaces throughout the house. None of the swabs tested contained DNA consistent with defendant's.

¶ 26    Michael Fannin, a sergeant with SPD, processed the Red Dodge Challenger located in the rear of the house. A search warrant for the vehicle showed Williams was the registered owner. Latent fingerprints were obtained from the hood of the vehicle and the exterior driver's door handle. Two fingerprints from the door handle were later determined to be from Smith. Fannin testified it appeared someone had rummaged through the vehicle while attempting

to steal it. The driver's side window was also broken. A brick was found nearby and was consistent with a red substance seen on the broken window. Fannin collected several DNA swabs from the vehicle and the brick. The DNA swabs from the brick and the prints from the vehicle's door handle were consistent with coming from Smith.

¶ 27    Michael Mack, a police detective with SPD, testified he obtained a search warrant for the house's security system. The police were unable to recover any video, but they received entry logs for the front door. The logs showed the front door was opened at 1:49 p.m. on August 9, 2021, which was approximately when officers responded to the scene. Prior to that, the front door had not been opened since 1:06 a.m. the same day.

¶ 28    5. *Jason Sloman*

¶ 29    Jason Sloman, a detective with SPD, testified, in the days following the homicides, the police collected video evidence from numerous locations around the crime scene. Surveillance video from IHOP showed English and Williams leaving at roughly the same time as Smith and Whiteside, at approximately 11 p.m. English and Williams got into a black SUV belonging to English, while Smith and Whiteside got into a silver Jeep.

¶ 30    The following surveillance video was collected from the homes surrounding 2517 South 10th Street. For reference, South 10th Street runs north-south, with 2517 South 10th Street located on the west side of the street. An alley also runs north-south directly behind 2517 South 10th Street. The block of South 10th Street where the house is located intersects with East Oberlin Avenue to the north and Bryn Mawr Boulevard to the south. Around 12:58 a.m., a dark red four-door vehicle with a silver front quarter panel and silver hood is seen driving south on 10th Street and turning west onto Bryn Mawr Boulevard. Around 1:05 a.m., surveillance video from a house across the street shows three individuals standing on the front porch of 2517 South

10th Street. Around 1:14 a.m., the red vehicle is seen coming out of the alley behind 2517 South 10th Street and turning west on East Oberlin Avenue. Around 1:51 a.m., the red vehicle is seen returning to the alley behind 2517 South 10th Street. The police did not recover any surveillance video showing the red vehicle leaving the area a second time.

¶ 31      Thereafter, Sloman put out a law enforcement bulletin to locate the red vehicle. Around two months later, Sloman determined the red vehicle was a 2007 Mercury Milan owned by Taylor Rosenberger. Rosenberger had totaled the vehicle in a crash a few days after the homicides, and the vehicle was in the possession of a towing company. The towing company gave the police possession of Rosenberger's vehicle.

¶ 32                  6. *Rosenberger*

¶ 33      Rosenberger testified, in August 2021, she was living with her boyfriend, Hembrough, and Steven McFadden and Marya Park in a house in Jacksonville, Illinois. She and Hembrough both sold methamphetamine at this time. She admitted she had previously abused methamphetamine and Xanax but was now seven months clean. Rosenberger knew Hembrough was friends with Galmore, who also went by the nickname "Fats." She confirmed she owned a red 2007 Mercury Milan with a gray hood in August 2021. She stated Hembrough would often drive the vehicle without her permission.

¶ 34      On August 8, 2021, Rosenberger overheard Hembrough talking on the phone to someone about "[h]itting a lick," which she explained was slang for robbing someone. She went to sleep around 7 or 8 p.m. that night. When she woke up on August 9, 2021, at around 7 or 8 a.m., her vehicle was missing and Hembrough was not home. Hembrough returned later in the morning in a black Ford pickup truck with a light-skinned individual she did not recognize. McFadden gave the individual a different set of clothes. Hembrough and Rosenberger left in the

truck, where Hembrough showed her a large quantity of methamphetamine. The unknown individual left Rosenberger's home around 1 or 2 p.m. After this incident, Rosenberger discovered a large quantity of little individual bags of fentanyl in the home. Rosenberger testified no one in the home used fentanyl, and she did not know Hembrough to sell fentanyl.

¶ 35        Rosenberger confirmed she was in a vehicular collision on August 13, 2021, which resulted in totaling her vehicle and the silver hood catching fire. Shortly thereafter, she and Hembrough were in another car wreck in Schuyler County. They both went to jail after methamphetamine was found in a bulletproof vest in the vehicle. Rosenberger believed it was the same methamphetamine Hembrough had shown her in the black pickup truck a few days earlier. They both bonded out of jail, but Hembrough was later arrested in October 2021 in Morgan County.

¶ 36        On cross-examination by Galmore's counsel, Rosenberger stated Hembrough told her he left behind a "clip" to his gun at the scene.

¶ 37                                7. *Hembrough*

¶ 38        Hembrough testified he was currently incarcerated in the Sangamon County jail. On August 8, 2021, Galmore texted Hembrough he was looking for a new connection for drugs. Galmore went to Hembrough's home and showed him a Snapchat video of an individual with a red vehicle and large amounts of money. Hembrough did not recognize the individual but later learned it was Williams. He testified he initially thought they would purchase drugs from Williams, but Galmore indicated they might get the drugs for free. Hembrough testified he understood this to mean they would commit a robbery.

¶ 39        Later that night, Galmore messaged Hembrough it was time to meet up. Hembrough, while armed with a Ruger 9-millimeter pistol and wearing a bulletproof vest, drove

Rosenberger's vehicle to Galmore's house in Jacksonville. A picture of a Ruger pistol and three magazines taken from Hembrough's cell phone was entered into evidence. After picking up Galmore, they drove to an apartment complex in Springfield and picked up an individual named "Junior." Hembrough did not know this person and later learned he was defendant. Defendant directed Hembrough to drive to an address on South 10th Street, and they did not discuss anything on the way. Around 1 a.m., they drove past the back of the house, circled the block, and then pulled the vehicle into the back alley of the house.

¶ 40 The group exited the vehicle and walked around to the front porch. Defendant knocked on the door, and English opened the door and let them in. Hembrough entered the dining room, while English went to the kitchen to retrieve a scale and a bag. Williams entered the room and started yelling at defendant for bringing people over to the house unannounced. Defendant put his head down and apologized to Williams. Galmore responded by pointing a Glock 34 pistol equipped with a switch "to make it automatic" at Williams. Williams laughed and moved to smack the gun out of Galmore's hand when the gun went off. Williams was shot multiple times in his left side and collapsed in the dining room. Hembrough then saw defendant turn and shoot English two to three times in the kitchen. Hembrough testified he had not seen either individual with a gun prior to that moment. Defendant took keys and money from Williams's pockets, and then defendant and Galmore went towards the bedroom at the front of the house. Hembrough testified he was in complete shock and started pacing before he heard another round of automatic gunfire. He ran to the front bedroom and saw defendant fire a single shot at a person who was cowering in the corner of the room.

¶ 41 At that point, all three individuals ran out the back door to Rosenberger's vehicle. Hembrough noticed a magazine on the ground next to Williams. He later realized the magazine

came from his firearm. Later testing determined the live rounds in the magazine did not match any of the spent cartridge cases recovered at the scene. Hembrough asserted he never pulled out his firearm, but it was possible he accidentally bumped the release during the incident. Hembrough testified they were in the house for around 5 to 10 minutes at most. As they were leaving, they tried to open the Red Dodge Challenger with the key defendant took from Williams to steal money but were unable to unlock it. The group got back into Rosenberger's vehicle, and Galmore and defendant realized no one had grabbed the drugs. Defendant ran back into the house through the back door and returned with a large gray bag.

¶ 42 The group pulled out of the alley and started to drive away when Galmore realized he did not have his phone. Galmore used Hembrough's cell phone to call his phone to see if he could hear it in the vehicle. They were near New Berlin, Illinois, when they turned around and went back to the house. Galmore found his phone in the back alley. The group drove back to Hembrough's house and split the drugs from the gray bag. Hembrough estimated there were five pounds of meth and nine ounces of fentanyl. After splitting up the drugs, defendant and Hembrough burned their clothes in a burn pile at the house. McFadden gave defendant a pair of pants and a shirt. Hembrough gave Galmore a ride back to his house, and defendant remained at Hembrough's home. When he left, McFadden and defendant were playing video games in the front room. After dropping off Galmore, Hembrough made several stops before returning to his house. He picked up Rosenberger and later showed her the methamphetamine. In the afternoon, Hembrough gave defendant a ride back home. Hembrough testified he later sold his Ruger pistol to defendant. The firearm was never recovered by the police.

¶ 43 A few days later, Hembrough and Rosenberger were in a vehicular collision in Schuyler County that resulted in the vehicle being totaled. Hembrough and Rosenberger were

arrested after the police discovered methamphetamine in the vehicle. Hembrough stated this was the same methamphetamine he obtained during the robbery.

¶ 44    On October 18, 2021, Hembrough was arrested for possession of a firearm by a felon and possession of stolen property in Morgan County after officers executed a search warrant at his house in a different case and found a Polymer 80 ghost gun and an SKS rifle. Later testing determined none of the cartridge cases recovered from the crime scene matched Hembrough's Polymer 80 ghost gun.

¶ 45    On October 22, 2021, Hembrough came forward to the police at the Morgan County jail to provide information regarding the triple homicide at 2517 South 10th Street. In March 2022, Hembrough was charged with three counts of first degree murder in Sangamon County.

¶ 46    On cross-examination by Galmore's counsel, Hembrough stated he pleaded guilty to lesser charges in the Schuyler County case and the Morgan County case was dismissed. He was interviewed by the police twice in October 2021 and again in February 2022. Hembrough asserted he was completely truthful in his February 2022 interview. He admitted he lied to the police about being present for the murders during his first two interviews in October 2021, instead telling the police defendant and Galmore showed up at his house with two kilos of methamphetamine. He also admitted he lied about not knowing what vehicle was used, telling the police it was a maroon passenger car, and about letting Galmore use his cell phone. When asked, Hembrough agreed he told the police at his first interview, "I'm trying to do everything I can to save my own bacon." In the February 2022 interview, Hembrough finally admitted to the police he had been present at the murders.

¶ 47    On cross-examination, defense counsel questioned Hembrough's motivation in

pleading guilty two weeks before the trial and agreeing to testify against defendant in exchange for a 20-year sentence. Defense counsel attacked the inconsistencies between Hembrough's statement to police in February 2022 and his trial testimony. Counsel then accused Hembrough of "repeatedly [lying]," including lying during his police interviews and to the jury at trial. Hembrough acknowledged lying in his October 2021 interview but denied lying during his trial testimony. Counsel then asked, "[Hembrough], you're a liar, right?" Hembrough responded, "No."

¶ 48 On redirect examination, the State asked, "In order to get 20 years for first-degree murder, was there something you were required to do?" Hembrough responded, "To give an honest and truthful statement." The State followed up, "And if you are not honest and truthful, what happens to this 20 years?" Hembrough replied, "They revoke the plea, and I face the full sentence of the charges."

¶ 49                                              8. *Pullings*

¶ 50 Following Hembrough's testimony, the State sought to admit Pullings's testimony as a prior consistent statement by Hembrough to rebut an accusation of recent fabrication or a motive to testify falsely. Specifically, the State sought to admit Pullings's testimony to show the plea deal did not influence Hembrough's testimony. Defense counsel objected, and the trial court allowed the testimony. Counsel did not request a limiting instruction for the jury.

¶ 51 Pullings testified, in October 2021, he was in custody at the Morgan County jail due to pending burglary and drug charges. His cellmate was Hembrough, who he had known since he was a child. Hembrough told Pullings he was involved in a triple homicide over on "10th Street." Hembrough said "Fats and the white dude" from Springfield were also involved. Hembrough told Pullings he drove the group to the house on 10th Street. After the group went

inside, a "dude with the gold teeth" came out of a bedroom and asked why they were there. "Fats" shot the individual with the gold teeth with an automatic weapon. The group took methamphetamine and fentanyl from the house. They tried to unlock a new Dodge Charger to steal more money but were unsuccessful. The group left and returned to Hembrough's house. Hembrough told Pullings he flushed the fentanyl because he could not sell it for the price he wanted. He also told Pullings he accidentally left a magazine from his gun at the house.

¶ 52    On cross-examination, Pullings admitted he told the police he thought Hembrough might be lying and Hembrough threatened to kill him if he told anyone. Pullings reiterated Hembrough never told him the name of the third perpetrator. When Hembrough told him the third person was a "white guy," Pullings understood this to mean the third perpetrator was a White person.

¶ 53                                    9. *Tyann Miller*

¶ 54    Tyann Miller testified she was dating defendant in August 2021.In December 2021, defendant made statements to her about a robbery he was involved in. Miller recalled defendant was distraught and crying, and she heard him say, "[W]hy would you let me do this," and, "I shouldn't have did what I did." Defendant did not give Miller any details about the robbery and did not tell her what he did.

¶ 55                                    10. *Garrett Harney*

¶ 56    The State moved to admit records consisting of cell tower data and certifications of authenticity from AT&T and T-Mobile. Galmore's attorney stated, "No objection subject to cross and no objection to publish." Defense counsel stated, "Identical. Thank you, Your Honor."

¶ 57    Garrett Harney testified he had been employed by the Sangamon County Sheriff's Office for the past 12 years and was currently a detective. He specialized in "digital forensics,"

which he described as "a special branch of forensics that has to do with the analysis, examination, extraction of digital devices such as cell phones, computers, [and] cell data records." He stated he received training at the National Computer Forensics Institute and completed multiple specialized trainings with CellHawk. He had performed over 420 cell phone extractions and completed cell data mapping in over 115 cases. Harney's curriculum vitae (CV) noted he obtained a CellHawk user certification in August 2020. This was Harney's first time testifying as an expert in digital forensics.

¶ 58        Harney testified, in October 2021, he was contacted by SPD to assist in mapping the cell data records in this case. The State moved to admit State's exhibit Nos. 98 and 98A, consisting of defendant's cell phone location data and a T-Mobile certification of authenticity. Galmore's attorney stated, "No objection at this point, subject to cross-examination." Defense counsel stated, "Same. Thank you, Your Honor." The State also admitted without objection Hembrough's and Galmore's cell phone location data.

¶ 59        Harney stated the cell site location data was obtained through individual device extractions and search warrants sent to AT&T, Verizon, and T-Mobile. He also used cell tower data obtained from the phone carrier companies. Harney used the phone numbers associated with defendant's, Galmore's, and Hembrough's cell phones to narrow down the location data from the cell tower dumps for each device. Harney uploaded the cell site location data from the three devices and the cell tower dump data into CellHawk to generate a screen recording depicting the movement of the devices on a map. The State admitted without objection the CellHawk screen recording and several screenshots taken from the recording. Before playing the recording for the jury, Harney explained how he generated the screen recording using the CellHawk program:

        "I'll kind of explain the software just so everybody's kind of on the same

- 16 -

page. CellHawk is utilized in a browser like Chrome or Edge or Firefox. It's software that can map over Google maps. To kind of explain cell records real quick, I guess imagine yourself in an airplane. If you're looking down on your— you'll have towers mapped out on the earth. They're in different sections, so 360 degrees. Each sector is about 120 degrees. Whenever you're driving, so let's say you're driving down the interstate, your phone is communicating almost constantly but quite frequently with those towers. And as you drive on the highway, say you're going to Indiana, you're going to hit those—your phone is going to communicate with those towers as you drive along the interstate. What we're seeing here is when you see a color light up, you're seeing a sector of that tower light up, indicating what size of tower the phone is communicating with."

¶ 60        The CellHawk mapping of the three devices depicted the following. On August 9, 2021, around 12:42: a.m., all three devices were pinging off the same tower in Springfield near the crime scene. Around 1:24 a.m., Hembrough's device was pinging a tower west of Springfield, while Galmore's device remained in the same area near the crime scene. Around 2 a.m., all three devices were moving away from the crime scene, and by 2:20 a.m., all three devices were pinging off towers in Jacksonville.

¶ 61        Defense counsel declined to cross-examine Harney.

¶ 62                              11. *Ryan Maddox*

¶ 63        Prior to Ryan Maddox's testimony, the State offered a limiting instruction regarding defendant's and Galmore's jailhouse calls. Galmore's counsel stated, "Your Honor, I understand what they are doing and I have no objection." Defense counsel added, "I welcome the instruction, Your Honor."

¶ 64    Maddox, a detective with SPD, testified he was the lead detective in this case. During an August 2021 police interview, Smith told Maddox he saw defendant in possession of a Glock 19 pistol at the party on August 8, 2021. A recording of the interview was entered into evidence without objection.

¶ 65    The State admitted without objection the phone records from defendant's, Hembrough's, and Galmore's cell phones. The call logs showed a call was placed from Hembrough's phone to Galmore's phone at 1:23 a.m. and 1:27 a.m. on August 9, 2021. The logs also showed a call was made from defendant's phone to Hembrough's phone at 3:30 a.m. on August 9, 2021. The logs for Galmore's phone showed his device received a call from defendant's device at 9:23 p.m. and 11:11 p.m. on August 8, 2021. The logs also showed Galmore's phone made an outgoing call to defendant's phone at 12:46 a.m. on August 9, 2021.

¶ 66    Maddox testified regarding the CellHawk screen recording that was created using the cell site location data from the devices of defendant, Hembrough, and Galmore. He was not tendered as an expert witness, and his testimony was generally consistent with Harney's testimony on the CellHawk screen recording.

¶ 67    The State admitted without objection five recordings from Galmore's jailhouse calls. Immediately thereafter, the trial court instructed the jury, "With regards to People's Exhibits Number 101 ***, if you determine a defendant made a statement you should consider that statement as evidence only against the defendant who made the statement." The five recordings were played for the jury.

¶ 68    In the first jailhouse call recording, Galmore can be heard referring to "white boy" or "island boy" and insisting this person needed to take his weight. Maddox testified that taking one's weight meant "the person that's being spoken of needs to take accountability for something

that occurred." Galmore also makes a reference to "three bodies." Galmore made this call prior to defendant's arrest. In another jailhouse call made before defendant's arrest, Galmore can be heard saying, "Junior [needs to] come take his motherfuckin' charge." Maddox testified this phrase also meant the person being referred to needed to take responsibility for something that occurred. In a jailhouse call placed on March 2, 2022, the day of defendant's arrest, Galmore can be heard saying, "You know they caught island boy?" Maddox testified Galmore was not told there were any other suspects in the case.

¶ 69                    B. Closing Argument and Jury Verdict

¶ 70          In closing, the State argued that at the August 8, 2021, party, defendant "was in possession of something that he showed to Michael Smith. He was in possession of a Glock 19, a 9 millimeter firearm." The State reminded the jury they could use Galmore's jailhouse calls only against Galmore and not defendant. As to the content of Galmore's jailhouse calls, the State argued the following:

> "But as soon as defendant Galmore is arrested he starts to complain because he
> and *** Hembrough had been arrested but Island Boy has not. And then clarifies
> Junior needs to take his weight, which means responsibility, take accountability.
> And if there was any doubt that Galmore was talking about [defendant] on March
> 2nd, the day [defendant] is arrested Galmore says you know they caught Island
> Boy. Galmore knew who did it. And the reason he knew that is because he was
> there and he did it with [defendant] or Island Boy or Junior. That's how he knew
> to get on the phone and complain about the fact that he was being held in the jail
> and his friend wasn't. And you can use that against defendant Galmore."

¶ 71          Galmore's counsel argued, "You know as well as I do Hembrough's concocting

- 19 -

this story so he can get what he wants. He's then peddling that going on three years now. And finally they accepted it. He's succeeded. He saved his bacon." He further argued Hembrough lied in each of his police interviews and declared, "He's a liar then. He's a liar now." In defendant's closing argument, defense counsel reiterated that Hembrough told numerous lies during his police interviews.

¶ 72　　　　In rebuttal, the State argued:

"[Hembrough] took 20 years of his life away.

　　　He accepted that and so if 20 years of your life is gone is a deal, but there was a catch. Not only would he lose 20 years of his life, he had to tell the truth. And if he didn't, that 20 years, it's gone and he's looking at a potential life sentence. And not his version of the truth. Not even what the prosecutors want to hear. The truth. The judge decides that. And so [Hembrough] is not thinking to himself, what can I get away with? He is motivated to be truthful now."

¶ 73　　　　The jury found defendant guilty of the first degree murders of Williams, English, and Gant, armed robbery, and armed violence.

¶ 74　　　　　　　　　　C. Posttrial Motions and Sentencing

¶ 75　　　　In October 2024, defendant filed a motion for a new trial. The motion argued, *inter alia*, (1) the State improperly bolstered the credibility of Hembrough in its closing argument regarding Hembrough's plea agreement, (2) the trial court erred in allowing the State to introduce other-crimes evidence against defendant through Smith, and (3) the court erred in allowing Pullings to testify as to an alleged prior consistent statement by Hembrough.

¶ 76　　　　In December 2024, the presentence investigation report (PSI) was filed in the trial court. The PSI stated defendant's parents never married and ended their relationship shortly after

he was born. Defendant lived with his mother until 2018, when he moved in with his father. His father treated him more as a friend than a father figure and did not make him attend school. Defendant's criminal record included a juvenile conviction for possession of a stolen vehicle, a Class 2 felony, in 2019, and an adult conviction for aggravated unlawful use of a weapon, a Class 4 felony, in 2021. The employment history section of the PSI showed defendant worked various part-time jobs. Defendant dropped out of high school after his junior year and did not obtain a GED. He denied any psychiatric issues or being prescribed medication for a psychiatric condition. He reported using cannabis daily from when he was 10 years old and consuming alcohol on the weekends starting when he was 15 years old.

¶ 77　　　　In December 2024, the trial court held a hearing and denied defendant's motion for a new trial. The court immediately proceeded to a sentencing hearing. Defense counsel did not present any evidence in mitigation.

¶ 78　　　　The State requested a mandatory life sentence pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2024)). Defense counsel argued the following as to the sentence:

> "Your Honor, the Court is required here to impose a sentence that conforms with the proportionate penalties clause of the Illinois Constitution which specifically states under Article 1, Section 11 that all penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.
>
> Your Honor, as the [PSI] and the facts that were adduced at trial events [defendant] was an emerging youth at the time of the offense conduct. So I submit to the Court a sentence that conforms with Article I, Section 11 of the Illinois

Constitution of 1970 is the one that's embodied in [*People v. Buffer*, 2019 IL 122327,] that states any sentence greater than 40 years is a *de facto* life sentence for a youthful offender. So I would ask this Honorable Court to impose a sentence in conformity therewith. Thank you, Your Honor."

¶ 79    Defendant declined to present a statement in allocution and professed his innocence.

¶ 80    The trial court stated it considered the trial evidence, the PSI, the addenda, the victim impact statements, the history, character, and attitude of defendant, the evidence and arguments presented, and the statutory factors in aggravation and mitigation. As to the first degree murder convictions, the court stated, "[A]s required by statute, life in prison." The court further sentenced defendant to a concurrent 30-year sentence for the armed violence conviction. The armed robbery conviction merged into the first degree murder convictions.

¶ 81    In December 2024, defendant filed a motion to reconsider his sentence. He argued his mandatory life sentence violated the proportionate penalties clause of the Illinois Constitution because the trial court had no discretion to consider any mitigating factors relating to his individual characteristics as a young adult offender. The motion noted the PSI showed defendant had a difficult home life, dropped out of school, and started using drugs when he was 10 years old.

¶ 82    In January 2025, the trial court held a hearing and denied the motion, finding the statute required it to impose a mandatory life sentence.

¶ 83    This appeal followed.

¶ 84                    II. ANALYSIS

¶ 85    On appeal, defendant argues (1) the admission of his codefendant's jailhouse calls

deprived him of a fair trial and defense counsel was ineffective for failing to object to the calls; (2) he was denied a fair trial where the trial court admitted cell phone records that were not properly certified as business records; (3) counsel was ineffective for failing to object to the qualifications and testimony of two police detectives; (4) the court abused its discretion in allowing the admission of a prior consistent statement of a State's witness, and counsel was ineffective for failing to request a limiting instruction; (5) the court abused its discretion in allowing other-crimes evidence of defendant, and counsel was ineffective for failing to request a limiting instruction; (6) he was denied a fair trial when the State made improper comments during closing argument, and counsel was ineffective for failing to object to the comments; and (7) his sentence violates the proportionate penalties clause of the Illinois Constitution.

¶ 86                         A. Nontestifying Codefendant's Statements

¶ 87                                     1. *Plain Error*

¶ 88          Defendant contends his right of confrontation guaranteed by the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VI, XIV), was violated and he was denied a fair trial where the trial court admitted Galmore's recorded statements although Galmore did not testify and was therefore not subject to cross-examination. In addition, he argues the limiting instruction was insufficient to cure any prejudice against him. Defendant admits the error was not preserved but urges this court to review the argument for plain error.

¶ 89          The State contends defendant is precluded from raising this argument on appeal because he affirmatively acquiesced to the admission of the jailhouse recordings at trial.

              "When a defendant actively invites or acquiesces to the admission of a piece of
              evidence at trial, he cannot challenge the admission of that evidence as plain error

on appeal. This is so because invited error or acquiescence does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." (Internal quotation marks omitted.) *People v. Quezada*, 2024 IL 128805, ¶ 59.

¶ 90　　　　　In this case, defense counsel affirmatively acquiesced to the admission of the recordings. First, prior to trial, the parties stipulated to the foundation for the recordings of Galmore's jailhouse calls. Second, when the State moved to admit the recordings at trial, defense counsel asserted, "No objection, Your Honor." See *id.* (finding the defendant acquiesced to the admission of a video-recorded statement when defense counsel stated, " 'No objection, Judge' "). Later, when the recordings were published to the jury, Galmore's counsel asserted, "No objection, Your Honor." Defense counsel stated, "Same, Your Honor." As such, defendant is estopped from challenging the admission of the recordings under the plain-error doctrine.

¶ 91　　　　　　　　　　　2. *Ineffective Assistance of Counsel*

¶ 92　　　　　Next, defendant argues defense counsel was ineffective for (1) allowing Galmore's recorded statements to come into evidence without objection, (2) failing to seek the removal of all references to defendant in the recordings, and (3) failing to renew the motion to sever the trials based on the recordings.

¶ 93　　　　　Claims of ineffective assistance of counsel are evaluated under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). To prevail on a claim of ineffective assistance, a defendant must show counsel performed deficiently and the deficient performance prejudiced the defendant. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 76. To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective

standard of reasonableness.' " *People v. Hodges*, 234 Ill. 2d 1, 17 (2009) (quoting *Strickland*, 466 U.S. at 687-88). To establish prejudice, the defendant must show, "absent counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Gilker*, 2023 IL App (4th) 220914, ¶ 77. "If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (citing *Strickland*, 466 U.S. at 697).

¶ 94        Here, defendant cannot establish the prejudice prong of the *Strickland* test. Even if counsel erred in failing to object to the admission of Galmore's statements or to move to sever the trials, the result of the proceedings would not have been different. Hembrough clearly identified defendant as his accomplice in the robbery and as one of the shooters. His trial testimony about their locations and travels the night of the murders was largely corroborated by numerous surveillance videos and cell site location data. The surveillance videos showed a red vehicle with a silver front quarter panel and silver hood drive past 2517 South 10th Street around 12:50 a.m. The vehicle was later found to belong to Rosenberger. Around 1:05 a.m., three individuals are seen standing on the front porch of 2517 South 10th Street. Around 1:14 a.m., the red vehicle is seen driving out of the alley behind the house onto East Oberlin Avenue. Around 1:51 a.m., the red vehicle is seen returning to the alley behind 2517 South 10th Street.

¶ 95        The cell site location data extracted from defendant's, Hembrough's, and Galmore's cell phones, in addition to the cell tower data, also largely aligned with Hembrough's trial testimony and the surveillance videos. Around 12:42: a.m., all three devices were pinging off the same tower in Springfield near the crime scene. Around 1:24 a.m., Hembrough's device was pinging off a tower west of Springfield, while Galmore's device remained in the same area

of the crime scene. Around 2 a.m., all three devices were moving away from the crime scene, and by 2:20 a.m., all three devices were pinging off towers in Jacksonville. Additionally, the call logs from defendant's, Hembrough's, and Galmore's phones showed the three individuals were in communication with each other around the time of the murders.

¶ 96    The police also used the surveillance video to rule out other potential suspects. Surveillance video showed Smith and Whiteside did not return to 2517 South 10th Street after going to IHOP and instead stayed the night at Flakes's residence. Additionally, Medley's and Brewer's vehicles were not seen in the area of 2517 South 10th Street until the morning after the murders. The only vehicle seen going to and from 2517 South 10th Street around the time of the murders was Rosenberger's red 2007 Mercury Milan.

¶ 97    None of the weapons were ever recovered. However, ballistics testing of the spent cartridge cases revealed two firearms were used at the scene. It was also revealed that the unfired cartridges from the magazine found next to Williams, which Hembrough admitted belonged to him, did not match any of the spent cartridge cases. This evidence indicated Hembrough carried a third firearm, which was not fired during the commission of the murders.

¶ 98    There was little physical or forensic evidence linking defendant to the inside of 2517 South 10th Street. Defendant was excluded as a contributor for all the DNA swabs taken in the house and the red Dodge Charger. The only fingerprints consistent with defendant's were four fingerprints found on a glass jar. However, those prints were accounted for in a Snapchat video from the August 8, 2021, party, where defendant is seen holding the glass jar.

¶ 99    While the physical evidence was not overwhelming, there was certainly sufficient evidence of defendant's guilt such that there is no reasonable probability that, but for the admission of Galmore's jailhouse calls, the jury would have acquitted defendant. Because

defendant cannot show he was prejudiced by Galmore's jailhouse calls, his ineffective-assistance claim must fail.

¶ 100                                B. Evidentiary Claims

¶ 101        Defendant argues the trial court erroneously admitted the following evidence: (1) T-Mobile cell phone and cell tower records, (2) Harney's and Maddox's testimony regarding the cell phone records, (3) Pullings's testimony as to Hembrough's alleged prior consistent statement, and (4) other-crimes evidence depicting defendant as someone who "always had a gun on him."

¶ 102                                1. *Cell Phone Evidence*

¶ 103                                a. Cell Phone Records

¶ 104        Defendant argues the T-Mobile cell phone and cell tower records were not admissible under the business records hearsay exception because the accompanying certifications did not comply with Illinois Rules of Evidence 902(11), (12), and (13) (eff. Sept. 8, 2018)). He acknowledges he forfeited this issue but asks this court to review his claim under the first prong of the plain-error doctrine and for the ineffective assistance of counsel.

¶ 105        As to plain error, the State responds defendant is precluded from raising this argument on appeal because he affirmatively acquiesced to the admission of the certificates at trial. "Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues." (Internal quotation marks omitted.) *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 54.

¶ 106        In this case, defense counsel affirmatively acquiesced to the admission of the T-Mobile certifications of authenticity. In response to the State moving to admit each certificate,

counsel asserted defendant had no objection. As such, defendant is estopped from challenging the admission of the cell phone evidence under the plain-error doctrine.

¶ 107    We are also unpersuaded by defendant's ineffective-assistance argument. Defendant argues counsel was ineffective for failing to object to the admission of the certificates at trial and raising the issue in a posttrial motion. Again, "[a] claim of ineffective assistance has two elements: deficient performance and resulting prejudice." *Id.* ¶ 64. "Whether to object to matters such as foundation for evidence is, by and large, a matter of trial strategy." *People* v. *Probst*, 344 Ill. App. 3d 378, 387 (2003). "[W]e may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 108    Assuming, *arguendo*, the failure to object to the certificates was deficient performance, defendant cannot show there was a reasonable probability that if counsel had objected, the State would have been unable to cure the objection. See *Aquisto*, 2022 IL App (4th) 200081, ¶ 64. There is nothing in the record to suggest the State would not have been able to lay the proper foundation, either by obtaining new certificates or calling a witness who could authenticate the records. Accordingly, we find no basis for asserting a reasonable probability the State would be unable to cure any authentication objection.

¶ 109                              b. Expert Testimony

¶ 110    Defendant argues trial counsel was ineffective for failing to object to the testimony of Harney and Maddox regarding the historical cell site location data. He asserts both witnesses were unqualified and the State failed to lay a foundation for Harney's testimony on the CellHawk program.

¶ 111    To establish a claim of ineffective assistance, the defendant bears the burden to

show both (1) "his attorney's performance fell below an objective standard of reasonableness" and (2) " 'but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different.' " *People v. Bradford*, 2019 IL App (4th) 170148, ¶¶ 14-15 (quoting *People v. Houston*, 229 Ill. 2d 1, 4 (2008)). In deciding whether counsel was deficient, "[c]ourts must indulge a strong presumption that counsel's conduct is sound trial strategy." *Quezada*, 2024 IL 128805, ¶ 60 (citing *Strickland*, 466 U.S. at 689). " 'A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.' " *Bradford*, 2019 IL App (4th) 170148, ¶ 15 (quoting *People v. Simpson*, 2015 IL 116512, ¶ 35).

¶ 112        We first address defendant's argument as to Harney's qualifications. Defendant asserts Harney was unqualified to testify as an expert witness based on his allegedly inadequate explanation as to historical cell site analysis. However, Harney testified he (1) had been a police officer for 12 years; (2) specialized in digital forensics, which included the extraction, examination, and analysis of cell data records; (3) participated in multiple specialized trainings, including several trainings conducted by CellHawk; and (4) had performed over 420 extractions of digital devices and completed cell data mapping in over 115 cases. Had defense counsel objected to Harney's qualifications, the objection would not only have been fruitless but would have drawn attention to Harney's extensive training and experience in cell phone data analysis. See *id.* ¶ 14 ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection." (Internal quotation marks omitted.)). Defendant further offers nothing to suggest the State could not have presented additional testimony as an expert. To the contrary, Harney's CV, which was provided to defense counsel, contained even more information on Harney's extensive work in cell phone data analysis. Because we have determined defendant has

- 29 -

not satisfied the first *Strickland* prong, we need not address the second prong, whether defendant was prejudiced by counsel's allegedly deficient performance.

¶ 113 Defendant next claims, because the State did not lay a proper foundation for the CellHawk program, defense counsel was ineffective for failing to object to its admission. He contends Harney never testified regarding whether CellHawk was (1) generally accepted by experts in his field or (2) working accurately at the time it generated results. See *People v. Raney*, 324 Ill. App. 3d 703, 707 (2001). Defendant correctly notes in his reply brief that the State failed to address this argument in its appellee's brief. "Arguments omitted from the appellee's brief and raised for the first time at oral argument are forfeited." *People v. McCoy*, 2014 IL App (2d) 130632, ¶ 28. However, because forfeiture is a limitation on the parties but not the courts, we choose to address this claim despite the State's forfeiture. See *People v. Boston*, 383 Ill. App. 3d 352, 354 (2008).

¶ 114 Even if the first prong of *Strickland* was satisfied, the admission of the CellHawk recording was harmless error. "[W]hen the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result, the admission of the improper evidence can be considered harmless error." (Internal quotation marks omitted.) *People v. Diaz*, 377 Ill. App. 3d 339, 349 (2007). If the CellHawk screen recording were not admitted into evidence, the jury would have still learned of the whereabouts of defendant the night of the murders through Hembrough's testimony, which was corroborated through extensive surveillance video footage taken from various locations surrounding 2517 South 10th Street. Moreover, we cannot say there is a reasonable probability of a different outcome because even if counsel had objected, it is likely that the State would have immediately cured the foundation

deficiency by asking more questions concerning Harney's knowledge and experience with the CellHawk program. See *id.* at 350. Accordingly, even if we were to find the admission of the CellHawk screen recording was error, it was harmless.

¶ 115 Likewise, we find Maddox's testimony was harmless because he merely reiterated what was testified to by Harney. Again, had Maddox not testified to the contents of the CellHawk screen recording, the jury still could have relied on Hembrough's testimony, in conjunction with the surveillance videos, to find defendant guilty. Because defendant cannot establish he was prejudiced by Harney's or Maddox's testimony, his ineffective-assistance claim must fail.

¶ 116                                  2. *Prior Consistent Statement*

¶ 117 Defendant argues the trial court abused its discretion by allowing Pullings to testify regarding Hembrough's prior consistent statement because Hembrough's motive to lie predated the statement. He also argues counsel was ineffective for failing to request a limiting instruction preventing the use of the statement as substantive evidence.

¶ 118 Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019) provides a witness's prior consistent statement is admissible to rebut an express or implied suggestion on cross-examination the witness is motivated to testify falsely or the testimony is a recent fabrication. *People v. Williams*, 147 Ill. 2d 173, 227 (1991). This exception applies only if "the prior consistent statement was made before (1) the time of the fabrication; or (2) the existence of the motive to lie." *People v. Wheeler*, 186 Ill. App. 3d 422, 427 (1989). Further, a prior consistent statement may only be admitted for the sole purpose of rehabilitating the witness and cannot be used as substantive evidence. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99. A trial court's ruling admitting a prior consistent statement will not be reversed absent an abuse of discretion.

*People v. Randolph*, 2014 IL App (1st) 113624, ¶ 16. A court abuses its discretion where its decision "was arbitrary, fanciful, or unreasonable," or where "no reasonable person would agree with it." *Id.*

¶ 119　　　　During the defense's cross-examination of Hembrough, counsel attempted to damage Hembrough's credibility. Counsel began his questioning by asking Hembrough why he persisted in a plea of not guilty for over two and a half years, then suddenly pleaded guilty two weeks before trial. Counsel then interrogated Hembrough over why he took the 20-year plea deal in exchange for his testimony against defendant when he could have pleaded guilty without entering a plea deal. Counsel questioned whether Hembrough was telling the truth at trial and repeatedly accused him of lying in court.

¶ 120　　　　Defendant argues the trial court erred in allowing Pullings's testimony because Hembrough's motive to lie arose when he voluntarily gave his statement to the police five days before his conversation with Pullings. However, at that time, Hembrough was not a suspect, had not been charged in the offense, and he had seen no discovery in the case. Moreover, we find it notable the story Hembrough told the police in October 2021 was not the same story he told Pullings. In fact, Hembrough's statements to Pullings were far more inculpatory of his participation in the crime than his statements to the police. In his October 2021 police interview, Hembrough told the police he was not present at 2517 South 10th Street or involved in the crime at all, but he later told Pullings he participated in the robbery and gave him details about the crime that aligned with evidence later found at the scene. Furthermore, Hembrough did not admit to the police he was present for the homicides at 2517 South 10th Street until the February 2022 interview. Thus, we find the trial court did not abuse its discretion in allowing Pullings to testify to Hembrough's prior consistent statement.

¶ 121      Defendant's reliance on *People v. Terry*, 312 Ill. App. 3d 984 (2000), is misplaced. In *Terry*, the witness gave a statement implicating the defendant in a shooting *after* being taken in and questioned for two days at the police station, which meant the witness himself might have been a suspect. *Id.* at 995. Here, Hembrough made his statement to Pullings, a fellow inmate, prior to any indication he was a suspect or being charged in the case. He also talked to Pullings five days after voluntarily giving a statement to the police where he denied any involvement in the crimes. Hembrough did not speak to the police again until January 2022 and was not charged with the murders until February 2022. On these facts, we cannot find Hembrough had a motive to lie when he spoke with Pullings in October 2021.

¶ 122      Even if we were to find the trial court admitted Pullings's testimony in error, this would not warrant reversal in this case. "[A] court's error in admitting prior consistent statements will warrant reversal of the defendant's conviction only when a reasonable probability exists that the jury would have acquitted the defendant in the absence of the improperly admitted prior consistent statements." *Stull*, 2014 IL App (4th) 120704, ¶ 106. Pullings's testimony, while certainly damaging to codefendant Galmore, was much more speculative as to defendant's identity as the third perpetrator. Pullings testified Hembrough told him "Fats," who he identified in court as Galmore, was responsible for shooting the victim with the gold teeth. Pullings could not remember how the other two victims died. While Pullings mentioned there was a third individual who participated in the robbery and referred to this individual as "the white dude," he made no in-court identification of defendant. He also indicated Hembrough told him the third perpetrator was a White person. Thus, even if Pullings's testimony was admitted in error, it would not have warranted a reversal because the jury could have reached the same result based on other evidence implicating defendant in the murders.

¶ 123        Next, defendant argues defense counsel was ineffective for failing to (1) request a limiting instruction for Pullings's testimony and (2) object to the prosecutor's comment referencing Pullings's testimony during closing argument. Under the *Strickland* standard, defendant must show counsel's performance was deficient and he was prejudiced by counsel's error. See *Strickland*, 466 U.S. at 687. "Even in cases where prior consistent statements are properly admitted, such evidence must be accompanied by a limiting instruction informing the jury that the evidence should not be considered for its truth, but only to rebut a charge of recent fabrication." *Randolph*, 2014 IL App (1st) 113624, ¶ 20. "Our supreme court has noted that where the State argues that a prior consistent statement is the truth, and the jury is not instructed that the evidence should be considered for a limited purpose, the statement is being used as substantive evidence." *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 49. Here, counsel should have requested an instruction informing the jury to use Pullings's statements for rehabilitative purposes only. Because the jury was not instructed to avoid considering Pullings's testimony as substantive evidence, counsel was deficient in this respect.

¶ 124        Having determined counsel's performance was deficient, we must decide whether, but for counsel's error, there is a reasonable probability of a different outcome in the proceedings. First, we must reiterate that Pullings's testimony, while damaging to Galmore, did not meaningfully identify defendant as the third perpetrator. Second, absent Pullings's statement, Hembrough's testimony was otherwise corroborated by numerous surveillance videos, cell site location data, cell phone call logs, and ballistics evidence found at the scene. Therefore, defendant cannot show there is a reasonable probability of a different outcome at trial had counsel requested a limiting instruction.

¶ 125        Likewise, we find defense counsel's failure to object to the State's reference to

Pullings's testimony during closing argument did not prejudice defendant. "[I]t is improper for the State to refer to the prior consistent statements as substantive evidence in closing arguments." *Randolph*, 2014 IL App (1st) 113624, ¶ 20. Even if we assume counsel was deficient for failing to object to the prosecutor's comment, as discussed above, there was sufficient evidence to convict defendant. Accordingly, defendant cannot show counsel was ineffective for failing to request a limiting instruction or failing to object during the State's closing argument.

¶ 126                                3. *Other-Crimes Evidence*

¶ 127        Defendant argues the trial court abused its discretion by allowing Smith to testify to other-crimes evidence that depicted defendant as someone who "always had a gun on him.". He further argues defense counsel was ineffective for failing to request a limiting instruction regarding the other-crimes evidence.

¶ 128        Defendant contends he preserved this error for review. However, our review of the record reveals otherwise. In response to a question from defense counsel during recross-examination, Smith testified, "Yeah. Always see. [Defendant] always had a gun on him." Counsel asked one more question, and Smith left the stand. Thereafter, the trial court and the parties discussed a sidebar on the record where counsel expressed his concern that Smith had testified to impermissible other-crimes evidence. However, at no point did counsel object to or move to strike Smith's testimony. Given counsel's awareness Smith's testimony might introduce other-crimes evidence, the grounds for this objection became apparent immediately after Smith made the statement. "An objection to evidence is untimely if not asserted as soon as its ground becomes apparent." *People v. Brown*, 2023 IL App (4th) 220476, ¶ 34. Moreover, the "trial court is not obligated to exclude improper evidence where a defendant makes no objection, does not move to exclude it or does not disclaim the answers." *People v. Burage*, 23 Ill. 2d 280, 283

(1961). Therefore, we find defendant has forfeited this issue on review.

¶ 129    Forfeiture aside, defendant invited the error he now complains of. Smith's offending testimony was not elicited by the State but rather came out during defense counsel's re-cross-examination of Smith. "The State cannot be faulted for questions asked by defendant's counsel or responsible for its witnesses' answers to those questions." *Brown*, 2023 IL App (4th) 220476, ¶ 35. Defendant responds that defense counsel was "forced" by the State's prior questioning to delve into when Smith saw defendant with a gun. However, just before the statement at issue, Smith testified he told the police he had seen defendant with a gun on another occasion, but he did not see defendant with a gun at the party. Nevertheless, counsel again asked Smith to clarify when he saw defendant with a gun on another occasion, to which Smith answered with the allegedly improper statement. We cannot fault the State for defense counsel's decision to continue his line of questioning on when Smith saw defendant with a gun after he already elicited the responses he sought from Smith.

¶ 130    Next, defendant argues counsel was ineffective for failing to request a limiting instruction, such as Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), regarding the other-crimes evidence testimony. To prevail on a claim of ineffective assistance, " 'a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant.' " *People v. Peel*, 2018 IL App (4th) 160100, ¶ 39 (quoting *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010)). This court indulges a strong presumption that counsel's challenged action was the product of sound trial strategy. *Strickland*, 466 U.S. at 689. "The decision to not request a limiting instruction" has been found to be trial strategy "to avoid drawing undue attention to the other-crimes evidence." *Peel*, 2018 IL App (4th) 160100, ¶ 52.

¶ 131        Here, counsel's performance was not deficient. The decision not to request IPI Criminal No. 3.14 was likely trial strategy to avoid drawing more attention to Smith's assertion "[defendant] always had a gun on him." Furthermore, it is unclear whether IPI Criminal No. 3.14 would have been appropriate in this case. IPI Criminal No. 3.14 is used when evidence is admissible for one purpose, such as proving identity or intent, but not for another, such as demonstrating propensity. See *People v. Clark*, 2015 IL App (1st) 131678, ¶ 28; Ill. R. Evid. 105 (eff. Jan. 1, 2011). Here, the other-crimes evidence was not admitted for another purpose, so there was no proper purpose the trial court could have directed the jury to consider. A limiting instruction would have drawn the jury's attention to the statement, only for the court to then instruct the jury to ignore the statement completely. Under these circumstances, it was not objectively unreasonable for counsel to not request a limiting instruction. Because we have determined counsel did not perform deficiently, we need not address the second prong of *Strickland*. Accordingly, defendant was not denied the effective assistance of counsel.

¶ 132                           C. Prosecutorial Misconduct

¶ 133        Defendant argues the State engaged in prosecutorial misconduct during closing argument when it personally vouched for Hembrough's credibility and for suggesting the trial judge had already determined Hembrough was truthful, depriving defendant of his right to a fair trial. He acknowledges he has forfeited this issue but argues this court should review his claim as (1) plain error or (2) ineffective assistance of counsel for failing to preserve the issue for appeal.

¶ 134        Under the plain-error doctrine, this court may review unpreserved errors where (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or obvious error occurred and that error is so serious that it affected the

- 37 -

fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We first determine whether a clear or obvious error occurred at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 135 Prosecutors have wide latitude in making closing argument and "may properly comment on the evidence presented and reasonable inferences drawn from that evidence, respond to comments made by defense counsel that invite a response, and comment on the credibility of a witness." *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 47. "However, a prosecutor may not personally vouch for the credibility of a witness or bolster a witness's testimony." *Id.* A prosecutor does not cross the line of personally vouching for a witness's credibility if the jury has to infer the prosecutor is expressing his personal views. *Gilker*, 2023 IL App (4th) 220914, ¶ 130. Rather, the prosecutor " 'must *explicitly* state that he is asserting his personal views, stating for example, "this is my personal view." ' " (Emphasis in original.) *Id.* (quoting *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996)).

¶ 136 A prosecutor's comment during closing argument constitutes reversible error only where the comment was (1) improper and (2) substantially prejudicial. *People v. Williams*, 2022 IL 126918, ¶ 41. The alleged improper remark should not be examined in isolation but rather considered in the context of the entire closing argument. *Gilker*, 2023 IL App (4th) 220914, ¶ 125. This court reviews *de novo* whether a prosecutor's comment during closing argument was improper. *Id.* ¶ 127.

¶ 137 In this case, defendant complains of the following remarks made during the State's rebuttal closing argument:

"[Hembrough] accepted that and so if 20 years of your life is gone is a

deal, but there was a catch. Not only would he lose 20 years of his life, he had to tell the truth. And if he didn't, that 20 years, it's gone and he's looking at a potential life sentence. And not his version of the truth. Not even what the prosecutors want to hear. The truth. The judge decides that. And so [Hembrough] is not thinking to himself, what can I get away with? He is motivated to be truthful now."

¶ 138        We find these statements fall within the bounds of acceptable comments directed at Hembrough's credibility and the evidence in the case. During the State's redirect examination, Hembrough testified he agreed "[t]o give an honest and truthful statement" in exchange for a 20-year sentence. He testified, if he was not honest and truthful, the State would "revoke the plea, and [he would] face the full sentence of the charges."

> "A prosecutor who causes the promise of a witness to provide truthful testimony pursuant to a plea agreement to be revealed has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth. *** [B]ringing forth such an agreement does not constitute improper vouching for the credibility of the witness." *People v. Garcia*, 231 Ill. App. 3d 460, 473 (1992).

The State's closing argument appropriately recounted the evidence as to Hembrough's plea agreement, including his promise to testify honestly and truthfully. Notably, the prosecutor did not express his personal view as to whether Hembrough fulfilled this obligation under the agreement.

¶ 139        Furthermore, when viewing the closing argument in its entirety, it becomes apparent the prosecutor's statement was made to rebut the defense's remarks that Hembrough's

testimony was not truthful. See *Marzonie*, 2018 IL App (4th) 160107, ¶ 47 (stating that depending on the context, a prosecutor may "respond to comments made by defense counsel that invite a response[ ] and comment on the credibility of a witness"). In closing, Galmore's counsel attacked Hembrough's credibility, arguing, "You know as well as I do Hembrough's concocting this story so he can get what he wants." Galmore's counsel then accused Hembrough of lying throughout the investigation and declared, "He's a liar then. He's a liar now." Defense counsel also stressed Hembrough's lack of credibility in closing, arguing, "Hembrough's 100 percent truth is our 100 percent bull crap." The prosecutor responded in rebuttal by reminding the jury that Hembrough was now motivated to testify truthfully under the terms of the plea agreement. We do not find the prosecutor's statement in response to defense counsel's assertion about Hembrough's truthfulness amounted to vouching for Hembrough's credibility.

¶ 140        The cases defendant relies on are factually distinguishable. In *Marzonie*, the reviewing court found the prosecutor improperly offered his personal opinion on a witness's credibility when he argued the witness's plea deal " 'had nothing to do with this case. She testified she wasn't promised anything, that this case had nothing to do with her case. *You take that as the truth*. There is no evidence stating otherwise, and believe me, if there was, you would hear about it.' " (Emphasis in original.) *Id.* ¶ 58. In *People v. Williams*, 2015 IL App (1st) 122745, ¶ 16, the reviewing court found the prosecutor improperly injected his view the witness was truthful by arguing, " 'We don't just take everything he says for truth immediately, we check it out,' 'we corroborate' and 'don't just *** take the word of anyone.' " Unlike *Marzonie* and *Williams*, the prosecutor here neither explicitly asserted he was expressing his personal view as to Hembrough's credibility nor made any indication the State possessed information about Hembrough that the jury did not have.

¶ 141　　　　　We also find the prosecutor's comment regarding the trial judge did not usurp the jury's duty to assess Hembrough's credibility. Rather, the prosecutor was merely explaining to the jury the role of the judge as to the plea agreement. Under the plea agreement, Hembrough agreed to tell the truth during his testimony, and it was the judge who would determine whether Hembrough fulfilled that obligation. The prosecutor did not cross the line of asserting the judge had already made the determination that Hembrough told the truth. Defendant's argument is, in essence, that the prosecutor's comment created an inference from which the jury could extrapolate the judge had already determined Hembrough's truthfulness. However, as discussed above, we will not find reversible error based solely on an inference a jury could have drawn from a prosecutor's comment. See *Gilker*, 2023 IL App (4th) 220914, ¶ 130. Additionally, the jury received the following instruction:

> "Only you are the judges of the believability of the witnesses and of the weight to given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

See Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved Dec. 8, 2011).

¶ 142　　　　　Thus, the jury was fully aware of its role as the sole decision-maker as to the credibility of the witnesses. Defendant has failed to establish a clear or obvious error from the prosecutor's argument. "Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture." *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179. Consequently, defendant cannot prevail on his claim of plain

error or ineffective assistance of counsel.

¶ 143                                    D. Proportionate Penalties Clause

¶ 144          Defendant contends his mandatory life sentence violates the proportionate

penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the trial court

abused its discretion. Alternatively, defendant argues, if the record is insufficient to evaluate his

claim, defense counsel was ineffective for failing to provide a sufficient record.

¶ 145          The Illinois Constitution mandates "[a]ll penalties shall be determined both

according to the seriousness of the offense and with the objective of restoring the offender to

useful citizenship." Ill. Const. 1970, art. I, § 11. A statute violates the proportionate penalties

clause if " 'the punishment for the offense is cruel, degrading, or so wholly disproportionate to

the offense as to shock the moral sense of the community.' " *People v. Hilliard*, 2023 IL 128186,

¶ 20 (quoting *People v. Miller*, 202 Ill. 2d 328, 338 (2002)). In *Miller v. Alabama*, 567 U.S. 460,

489 (2012), the United States Supreme Court held the eighth amendment (U.S. Const., amend.

VIII) prohibits mandatory life sentences for juveniles who commit murder. In extending the

*Miller* court's reasoning, the Illinois Supreme Court "has not foreclosed 'emerging adult'

defendants between 18 and 19 years old from raising as-applied proportionate penalties clause

challenges to life sentences based on the evolving science on juvenile maturity and brain

development." *People v. Clark*, 2023 IL 127273, ¶ 87.

¶ 146          Defendant claims his mandatory life sentence violates the proportionate penalties

clause as it applies in this case, given he was 19 years old at the time of the offense and

experienced a difficult upbringing. A constitutional challenge to a statute may be facial or as

applied. *People v. Harris*, 2018 IL 121932, ¶ 38. "A facial challenge requires a showing that the

statute is unconstitutional under any set of facts, whereas an as-applied challenge is dependent on

the particular facts and circumstances of the challenging party." *People v. Williams*, 2024 IL 127304, ¶ 25. "An as-applied constitutional challenge is a legal question that we review *de novo*." *People v. Spencer*, 2025 IL 130015, ¶ 25.

¶ 147    Here, the trial court sentenced defendant pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2024)). Under section 5-8-1(a)(1)(c)(ii), "the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and *** is found guilty of murdering more than one victim." *Id.*

¶ 148    We find the trial court did not abuse its discretion in sentencing defendant to a mandatory life sentence because the court had no discretion to sentence him to anything less under section 5-8-1(a)(1)(c)(ii) of the Unified Code. See *id.* Although defense counsel briefly referenced the proportionate penalties clause in his argument at sentencing and asked the court to sentence defendant accordingly, as discussed below, the court lacked the requisite information to properly address this argument.

¶ 149    Courts have emphasized the record must be sufficiently developed to address as-applied challenges, including proportionate penalties arguments based on *Miller* or the developing brains of young adults. See, *e.g.*, *Harris*, 2018 IL 121932, ¶ 46; *People v. Thompson*, 2015 IL 118151, ¶ 37. "[A] reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Harris*, 2018 IL 121392, ¶ 41. "Without an evidentiary record, any finding that a statute is unconstitutional as applied is premature." (Internal quotation marks omitted.) *Id.* ¶ 39.

¶ 150    We find this court's reasoning in *People v. Moore*, 2025 IL App (4th) 240592-U,

instructive. The defendant in *Moore* was 18 years old when he committed first degree murder and was sentenced to 80 years in prison. *Id.* ¶ 2. The "[d]efendant's trial counsel emphasized [the] defendant's youth at sentencing and in a motion to reconsider." *Id.* ¶ 35. The PSI documented the defendant's lead poisoning diagnosis, various mental health disorders, and his qualification for special education programs. *Id.* On appeal, the defendant argued the PSI rendered the record sufficient to evaluate his proportionate penalties clause claim, and in the alternative, any insufficiency in the record was due to counsel's ineffectiveness. *Id.* ¶¶ 35, 41. We held the PSI and the attached records were not sufficient to address the defendant's claim, as "written documentation in a PSI showing [the] defendant's mental impairments does not eliminate the need for sworn testimony and factual findings specifically addressing the basis of the as-applied challenge." *Id.* ¶ 40 (citing *People v. Landerman*, 2018 IL App (3d) 150684, ¶ 56). As to the ineffective assistance claim, we found the defendant's argument was premature because we could not evaluate whether the defendant was prejudiced "without knowing what testimony or other evidence counsel could have provided." *Id.* ¶ 44.

¶ 151 Here, the record is even more sparse than the record in *Moore*, containing "only basic information about defendant, primarily from the [PSI]." *Harris*, 2018 IL 121392, ¶ 46. The record contains no data on the evolving science of juvenile maturity and brain development or how that science applies to defendant's specific circumstances. Furthermore, we reject the State's assertion that the sentencing hearing was an adequate substitute for an evidentiary hearing on this matter. At sentencing, no sworn testimony was presented, and the trial court made no factual findings addressing defendant's proportionate penalties clause claim. Therefore, we find defendant's as-applied challenge premature.

¶ 152 Alternatively, defendant argues defense counsel was ineffective for failing to

sufficiently develop the record in the trial court. Criminal defendants have a right to the effective assistance of counsel, including at sentencing. U.S. Const., amends. VI, XVI; Ill. Const. art. I, § 8; see *People v. Price*, 2011 IL App (4th) 100311, ¶ 36. Thus, the defendant must show his counsel's performance fell below an objective standard of reasonableness and counsel's deficient performance resulted in prejudice to the defendant. *Price*, 2011 IL App (4th) 100311, ¶ 34.

¶ 153 We find defendant's ineffective-assistance claim is also premature. Resolving defendant's ineffective-assistance claim at this juncture would require us to assume there was sufficient evidence that could have been introduced to show the *Miller* considerations applied to defendant as a young adult and would likely lead to a lesser sentence. Without knowing what testimony or other evidence defense counsel could have presented, we cannot evaluate whether defendant was prejudiced by counsel's failure to introduce mitigating evidence. See *Moore*, 2025 IL App (4th) 240592-U, ¶ 44.

¶ 154 Accordingly, we find the record is insufficient to address defendant's as-applied constitutional challenge. Because the claim is premature, defendant is not precluded from raising it in a postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)), where he can provide sworn testimony and evidence specific to his claim.

¶ 155                                   III. CONCLUSION

¶ 156 For the reasons stated, we affirm the trial court's judgment.

¶ 157 Affirmed.